Edward **LAUDENSLAGER** et al.

v.

**GLOBE–UNION INC.**

Civ. A. No. 21273.

United States District Court
E. D. Pennsylvania.

Dec. 11, 1958.

Melvin Alan Bank, and Samuel Polsky, Philadelphia, Pa., for plaintiff.

John R. McConnell, John C. Peet, Jr., and Thomas B. K. Ringe, Jr., Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

This action for damages and unpaid overtime, brought by some 88 employees of a corporation manufacturing automotive type storage batteries, is based upon alleged violations by the defendant corporation of (1) the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. and (2) the Pennsylvania Lead Manufacturers Act, 43 P.S. § 471 et seq.

In order to save the time of the Court and litigants, it was agreed that three of the plaintiffs should be selected and that their cases should be tried first, the thought being that, after the issue of the defendant's liability had been resolved in those cases, the claims of the remaining plaintiffs might be settled by agreement or, at any rate, could be disposed of more expeditiously. At the trial, it was further agreed that the Court should decide the issue of the exposure of employees to lead hazard throughout the entire plant and that the Court's findings should apply not only to the claims of the three plaintiffs in question but to those of all the rest. The trial was to the Court without a jury.

### The Cause of Action Under the Fair Labor Standards Act

The decision in Steiner v. Mitchell, 350 U.S. 247, 76 S.Ct. 330, 100 L.Ed. 267, established that, in a storage battery plant in which the employees are exposed to lead dust and lead fumes to a degree which makes it necessary for them to change their clothes, wash and shower in order to protect their health, time so spent by them is a principal activity and must be counted in measuring work-time under the provisions of the Fair Labor Standards Act. However, the Court did not, as the plaintiffs contend, lay it down as a matter of law that all workers in production in any storage battery plant are entitled to pay for the activities in question. The defendant in that case did not challenge the findings of the trial court that the clothes changing and showering of the employees in its plant were indispensable to the performance of their productive work, and did not make any issue of the amount of time found to be required. These matters were not in issue before the Supreme Court. The defendant contended that, even so, these activities could not be counted as work-time, being excluded by the Portal to Portal Act, 29 U.S.C.A. § 251 et seq. as

preliminary or postliminary. The facts of each case and the conditions existing in each plant, as found by the trial court, will still determine whether in any given plant the exposure is such as to make these activities so necessary to productive work and so integrally related to it as to take them out of the preliminary and postliminary categories.

The plaintiffs contend that all the men engaged in production in this defendant's plant are so exposed. The defendant admits that a group of some 18 or 20 in each shift (whom it designates as "lead workers") are exposed to lead dust in the air, but maintains that, as to them, the plaintiffs have failed to meet the burden of proving that the degree of exposure was sufficient to necessitate changing, washing and showering and that, as to the rest, the evidence shows no hazardous exposure at all.

■ I made a personal inspection of this defendant's plant and, based on what I saw in connection with the testimony, plans and photographs, have reached the conclusion that the men employed in the plant, except the office personnel, are exposed to lead and acid hazard in varying degrees but all of them to an extent which necessitates their changing into work clothes, washing their hands before lunch and bathing at the end of the day.

Almost all of the production activities of the plant are carried on in one large room without partitions. In this room both lead dust and lead fumes are generated at various locations. The defendant uses hoods over these points of generation in an effort to minimize the hazard but this does not entirely eliminate it. The lead dust and fumes must, in the nature of things, be present to some extent throughout the entire room, and the workers in going about the plant will frequently pass close to some of the points of generation and will carry the dust on their clothes and shoes from one part of the room to another. Furthermore, as stock is moved about the plant, lead dust is in many cases carried with it, and, of course, when the floors are swept, as they are rather frequently around the dustier operations, this creates more dust. It would seem that in a plant of this kind, lacking partitions to seal off areas where lead dust and fumes are generated, it is a practical impossibility to confine the hazard to such areas, particularly with all the men using the same locker rooms and lunch rooms.

A few of the operations of the plant are conducted in rooms partitioned from the large main room. The men engaged in these operations either handle sulphuric acid, which is occasionally spilled on the floor or their clothing or skin and the fumes of which are unmistakably in the atmosphere, or they handle cartons in which the batteries are packed. Those exposed to acid must, of course, shower for the protection of their health, and those doing the packing must also shower because lead dust is present on the cartons they use or collects on the batteries they put into them, and here again occasionally some spilled acid will be upon some of the materials they work with. I think, therefore, that they too should change their clothes and shower.

■ There was expert testimony on both sides based upon samples of air taken at different places in the plant, showing varying degrees of concentration of lead dust. These tests, of course, are relevant but they are not conclusive and the entire picture presented by the evidence, with the plant itself as a principal exhibit, must be taken into consideration.

Lead poisoning, in general, comes about in two ways—inhalation of lead dust and fumes and ingestion of lead particles through the mouth or entry into the body through abrasions of the skin. By far the most common and most dangerous of these is the first. Changing clothes is necessary to keep the men from carrying the dust into their homes and breathing it there, but, beyond this, there is very little that can be done to prevent inhalation of toxic particles except partitioning the plant, perfecting the system of air cleansing and furnishing the men with respirators.

Of the 24 minutes spent by the men in various precautionary activities, by far the greater part is spent in washing and showering. Of course, if it were true that lead poisoning could be caused *only* by breathing, washing would be useless as a measure of protection. However, the fact that washing and bathing are directed to eliminating the lesser of two dangers does not mean that they are not necessary precautions. I do not see how it can be argued that if one's hands and body become contaminated by lead dust there is no need to wash it off, and yet that seems to be the point to which the defendant's argument on this branch of the case leads.

The claims of the plaintiffs under the Fair Labor Standards Act are for unpaid overtime work and are based upon their contention that the compensated time which the defendant allows for precautionary activities in combatting the lead hazard is insufficient. The Fair Labor Standards Act is concerned only with pay for overtime work. Unless, therefore, the time spent by them in productive work plus the time which is reasonably necessary to allow them to perform these activities adds up to more than 40 hours per week, it is immaterial, so far as their cause of action under that Act is concerned, at what rate they are compensated for the 24 minutes a day so spent, as long as the minimum wage provisions of the Act are met.

■ The three plaintiffs whose cases were tried had worked for the most part not more than 40 hours per week counting two hours for changing clothes and washing as work-time. However, there remains the question of what rate of overtime should be paid to a man who has worked more than 38 hours in production so that his total work-time is more than 40. The system employed by the defendant is to guarantee to each man for each weekly pay period an amount of money equivalent to 40 hours at the basic wage. Of course, the men are paid more than this basic wage under the incentive plan by which one hour's work is taken to be 100 points and, if over the entire week a man earns more than the week's quota of points, he is paid additional sums in accordance with the amount of excess points he has earned. When overtime is paid, it is at a minimum rate of one and one-half times the basic wage, but here again the employee may earn additional sums under the incentive plan which, while he is working overtime, allows him one and one-half times his regular point rate. This procedure does not conflict with the definition of regular rate set forth by the Supreme Court in Bay Ridge Operating Co. v. Aaron, 334 U.S. 446, 464, 68 S.Ct. 1186, 92 L.Ed. 1502, and corresponds with the answer given by the Wage and Hour Administrator to an inquiry directed to him as to whether or not it was a proper practice.

■ The propriety of making an allowance of compensated time for activities needed as a protection against lead hazard seems to have been recognized by both the defendant and its employees for a number of years. The union contracts covering the years from 1950 to February 7, 1957, all provided for allowances which averaged 24 minutes a day for this purpose for all employees. There is no suggestion that the union contracts are not bona fide collective bargaining agreements or that there was ever any departure in practice from their terms. Consequently, inasmuch as time in excess of that fixed by the contracts was necessarily excluded by these provisions, there can be no liability on the part of the company to pay for such excess time, if any there was, prior to February 7, 1957. Fair Labor Standards Act, 29 U.S. C.A. § 203(*o*).

After the decision of the Supreme Court in Steiner v. Mitchell, supra (January 30, 1956), Article VIII of the union contracts which provided for a wash up period was changed by the contract dated February 7, 1957, to read "The Company and Union will abide by the full provisions and decisions of appropriate State and Federal regulations pertaining to this industry. Elimination of the previous old Article VIII, Sec. 1 of the 1955–

56 contract titled 'Wash Up Period' shall in no way be interpreted as bargaining away any rights which the employees may have under state regulations or laws and may have under the recent Supreme Court decision of Morris Steiner vs. Mitchell."

There are plenty of Federal regulations issued under the Fair Labor Standards Act but none applicable to the immediate question before the Court has been brought to my attention and, therefore, the act itself as interpreted by the Supreme Court in Steiner v. Mitchell, supra, and other cases, is the sole guide by which the plaintiffs' rights in this case are to be determined.

■ Since February 7, 1957, (as well as prior thereto) the defendant has allowed its employees 20 minutes each day wash up time four days in each week and 40 minutes on the fifth day which results in the employee being employed for 38 hours each week, excluding his wash up time, plus a total of two hours each week allotted to wash up, or an average of 24 minutes per day in a five-day week. Is this reasonably sufficient?

There is testimony that some of the men actually take more than this amount of time, but the question is not what any one employee does [1] but what is a reasonable time allowance. A "reasonable time" cannot be an exact concept and in situations of this kind trifling deviations will be encountered and can be overlooked.

A time study conducted by the defendant at its Philadelphia plant showed that the men took an average of 6.06 minutes to change from street clothes into work clothes at the beginning of the day, 2.84 minutes to wash their hands before lunch, and 17.54 minutes to shower and dress at the end of the day, making a total of 26.44 minutes. It is to be noted,

however, that the men who were being clocked knew what the existing controversy was about, they knew they were being timed, and they must have been aware that the defendant would use the results of the check in the pending lawsuit if they should prove favorable to it. Under these circumstances it is highly improbable that they would make any great effort to keep the time required to the minimum really needed. This is borne out by the fact that at one of the other plants of the defendant (Hastings) where no controversy existed, the average time for the changing of clothes in the morning was 3.37 minutes, for washing at noon 2.32 minutes, and for changing and showering in the afternoon 16.31 minutes, making a total of 22 minutes. [2]

The employees involved in the studies were "lead workers"—men who work on the pasting machines, oxide mixers, burning wheels and dry charge where lead dust and fumes are generated. The distinction between them and others in the plant is of importance in this connection because it is obvious that, by reason of their greater exposure to lead dust, it is more than likely that they require more time than the others in scrubbing and perhaps in using detergents.

The claims for overtime based upon the physical examinations are too trivial to merit serious consideration. A sample of blood for a cell count is taken from most of the men as often as once a month. This might take a minute and a half per man. In addition, each man twice a year gets what the company doctor described as a "complete" physical examination. This complete physical examination might possibly take as much as five minutes. The evidence is very vague as to how often the physical examinations were performed after the end of the work day, rather than during

1. For example, two of the plaintiffs testified that it took them an average of 13½ minutes in the morning to take off their street clothes and put on work clothes— statements which, even if true, I simply

cannot accept as reliable evidence of what constitutes a reasonable time.

2. I have not considered any of the time studies not taken by the witness Eschner personally.

working hours, but assuming that they always took place after the end of the day, the total time thus spent by any one employee in an entire year would not be much over 30 minutes.

A careful consideration of all the testimony in the case leads me to the conclusion that 24 minutes a day is a reasonable allowance for employees other than those classified by the defendant as lead workers and that for lead workers, while it may be a matter of a minute or so short, the difference is de minimis[3].

I am, therefore, of the opinion that the defendant is entitled to judgment upon the plaintiffs' first cause of action.

### The Cause of Action Under the Pennsylvania Lead Manufacturers Act

 Prior to the trial, an amendment to the second cause of action adding a claim for impairment of health, reduction of life expectancy, increased susceptibility to other diseases and the like, alleged to have been caused by the defendant's negligent failure to perform the common law duty to furnish a safe place to work, etc., was proffered by the plaintiffs. The amendment contained other items of claim as well and, as to them, it was allowed. However, the Court disallowed the part summarized above, on the ground that the cause of action pleaded was barred by the election of the parties to accept the Pennsylvania Workmen's Compensation and Occupational Disease Acts, 77 P.S. §§ 1 et seq., 1201 et seq. The amendment pleaded no more than a claim against an employer for personal injury incurred or occupational disease contracted by employees in the course of their employment. The attempt by the plaintiffs to escape the provisions of these Acts by arguing that "lead absorption" is not covered by the compensation Acts, which deal with lead poisoning, cannot be sustained. The testimony clearly demonstrates that lead absorption as used by the witnesses merely means that the plaintiffs have not absorbed enough lead into their bodies to cause disability. It is nothing more or less than a form of lead poisoning, though not compensated for by the Act, since it is not disabling.

In an opinion filed November 12 of this year in Eisenmann v. Gould-National Batteries, Inc., D.C., 169 F.Supp. 862, I held that a statute of the State of New Jersey, N.J.S.A. 34:6–50, containing substantially the same provisions as the Pennsylvania Lead Manufacturers Act of 1913, 43 P.S. § 474, was a penal statute intended to protect the health interest of employees and not their financial interests and did not create a private cause of action. The decision of the Court of Errors and Appeals in Pericin v. Denburg's Modern Bakery, 130 N.J.L. 547, 33 A.2d 825, so held, and the question was foreclosed for causes of action arising in New Jersey. However, the reasoning of that opinion, as well as what was said in the opinion of this Court referred to above, is fully applicable to the Pennsylvania Act and need not be set forth at length here. It may be noted, however, that both Acts provide penalties both for the employer's failure to furnish facilities and for the employees' failure to take advantage of them, and it could hardly have been the intention of the legislature to give the employer a private cause of action in case the employee's violation caused the employer any loss. The statute is a penal one and calls for strict construction not only under general principles of statutory interpretation but by virtue of the Penn-

3. "The workweek contemplated by § 7(a) must be computed in light of the realities of the industrial world. When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded. Split-second absurdities are not justified by the actualities of working conditions or by the policy of the Fair Labor Standards Act. It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved." Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 692, 66 S.Ct. 1187, 1195, 90 L.Ed. 1515.

sylvania Act of March 21, 1806, P.L. 558, 46 P.S. § 156.4

It is, therefore, my opinion that the Pennsylvania Lead Manufacturers Act does not create a private civil cause of action and that the defendant is entitled to judgment upon the plaintiffs' second cause of action.

The defendant contends that the Pennsylvania Lead Manufacturers Act has no application to it since the evidence shows that it is engaged in the manufacture of storage batteries and not of any of the chemical compounds of lead enumerated in Section 2 of the Act. That issue was not touched in the Eisenmann case. The Eisenmann decision was upon an application by the plaintiffs to amend the complaint and a motion for summary judgment by the defendant, and the Court did not have before it any evidence as to the character of the manufacturing operations carried on in the defendant's plant beyond the fact that it made electric storage batteries. In view of what has been said to the effect that the Act, if applicable, does not support the plaintiffs' second cause of action, I deem it not only unnecessary but unwise to attempt to decide the question. The issue raised by the defendant concerns the jurisdiction, powers and duties of the Departments of Labor and Industry and of Health of the State of Pennsylvania. Neither those departments nor the State itself are parties to this litigation and a question affecting their relationship to a large industry of the state should not be decided in their absence, unless necessary to the disposition of the matter before the Court, since they have had no opportunity to brief, argue, or present evidence in the matter. Under these circumstances, I think that this Court should refrain from passing upon the question.

4. "In all cases where a remedy is provided, or duty enjoined, or anything directed to be done by any act or acts of assembly of this commonwealth, the directions of the said acts shall be strict-

ly pursued, and no penalty shall be inflicted, or anything done agreeably to the provisions of the common law, in such cases, further than shall be necessary for carrying such act or acts into effect."