W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

FLINT RIG COMPANY, a corporation, Defendant (two cases).

Civ. Nos. 373, 374.

United States District Court
D. Montana,
Billings Division.

Oct. 23, 1963.

708

Charles Donahue, Sol. of Labor, Washington, D. C., Altero D'Agostini, Acting Regional Atty., H. A. Kelley, and Thomas P. Delaney, Seattle, Wash., for plaintiff.

Cooke, Moulton, Bellingham & Longo, Billings, Mont., for defendant.

JAMESON, District Judge.

These actions were brought pursuant to the provisions of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 et seq., to recover unpaid minimum wages and unpaid overtime compensation allegedly due six of the defendant's employees.

Defendant is engaged in the construction, repair, servicing, and maintenance of facilities for the production, conveyance, and transmission of crude oil. In carrying on this business, defendant employed certain personnel as "crew foremen". These actions have been brought on behalf of these foremen.

Defendant's work required its crews to travel to various oil fields situated some distance from the towns where the employees resided. It was the established custom and practice for the crew to ride to the oil field in defendant's truck at the commencement of each day, and to return to town in the same truck at the close of the day's work in the field. It was also the established custom and practice of the defendant, and of the industry as a whole, to pay all employees for the trip to the oil fields. Employees were not ordinarily paid for the return trip, and there is no contention that the defendant was required to pay any employees except the foremen who drove the trucks.

It was the ordinary practice for the foremen to do the driving, although I cannot find from the evidence that they were required to do so.[1] The crews would leave town from a designated place at 7:00 A. M. When they returned in the evening the foremen parked the trucks in front of their homes. There is no evidence that the trucks were ever parked at the defendant's yard or that the foremen and crews were required to return to the defendant's premises or any other designated place. According to defendant's district supervisor, the foremen could use the trucks personally in the evenings if they wished to do so, but any personal use was rare.

On occasions, at a customer's request, supplies and material were hauled to the oil field in the trucks.[2] Less frequently material was hauled from the field to town.[3] While admittedly of benefit to the customers, there is no evidence of any contractual obligation on the part of

1. One of the foremen testified that he was instructed by the district supervisor to drive the truck himself and let no one else do so, following an accident when another member of the crew was driving. The district supervisor testified that he told the foreman that he did not want the crew member who had the accident to drive. None of the other foremen testified that they were instructed that no one else might drive, although it is clear that the foremen did practically all of the driving.

2. These were not supplies and materials furnished by the defendant, but rather supplies and materials belonging to the customer and hauled from the customer's or supplier's premises.

3. There is uncertainty with respect to the frequency with which supplies and materials were hauled from town to the field for customers. Defendant's district supervisor said it would probably happen about once every two weeks for Shell

the defendant to provide this service.[4] Whenever a truck was used to haul material on the return trip, all employees, including the foremen, were paid. These actions relate solely to compensation for the foremen when no material was hauled from the field to town.

The trucks were serviced in town each week by local service stations. The trucks and other equipment which remained in the oil fields were serviced on the average of once a month. The additional service jobs on the trucks used for transportation were required by the additional miles the trucks traveled in transporting the crews. The foremen had to have the gas tanks filled each day. Apparently, as a general rule, this was done in the morning. There is no evidence that it was necessary for any employee to have the gas tank filled outside of the time in the morning for which he was compensated.

Each truck was equipped with a tool box fastened to the truck and permanently assigned to that particular truck.[5] The tools and equipment were used on the work in the oil field, but there is no evidence that they were ever used off the job, or that there was any reason for their transportation to and from the job.[6]

Defendant's officials testified that the employees were not required to use the trucks for their transportation to and from work. There is no evidence to the contrary. Obviously it was to the employees' advantage to use the transportation afforded by the trucks, and it has been the custom and practice of the defendant and of the industry to provide such transportation to and from the oil fields. It is clear that the primary pur-

Oil Company, but more frequently for Texaco and more frequently on contract jobs. One of the foremen said that he sometimes hauled every day and sometimes once or twice a week. It is established clearly from the facts stipulated in the pretrial order that the backhauls were infrequent; 31 of 448 trips for Gain; 31 of 364 for Koepke; 1 of 65 for Randall; 1 of 58 for Ziegler; and none in 223 trips for Pratt and 76 trips for Slaathaug; or a total of 64 for 1234 trips.

4. Defendant's district supervisor testified in part:

"Q. In other words, part of your job in working for the company was not hauling materials for them?

"A. That is right.

"Q. If they needed materials and needed replenishment of stock of a large order, was that supplied and done and hauled for them by their supplier?

"A. Yes, I am sure that it was because we did not normally haul large loads of supplies to their fields.

"Q. In other words, would the transportation of anything from the town of Glendive to your customer be an occasional transportation of something they had run out of such as some small part?

"A. Yes.

"Q. Could you describe the type of thing you might haul for them if they asked a man to haul something in the next day?

"A. Normally it would be pipe nipples, small sizes, small valves, 2, 3 or 4 inch maybe, a joint of pipe, or something of that nature.

"Q. It would be an extraordinary thing they may have run out of?

"A. Yes.

"Q. So that the real job of the crew foreman and the crews involved in this cause of action had nothing to do with hauling construction equipment and supplies from town out to the well site?

"A. That is right." (Tr. pp. 38, 39.)

5. Apparently the total complement of tools for the truck weighed about 250 to 300 pounds and consisted of "shovels, bars, levels, tongs, saws, files, hammers, cement tools, and so on," together with pipe wrenches, threaders, pipe cutters, etc., carried in a box.

6. Plaintiff argues that one of the purposes of the return trip was the "protection of the trucks and the equipment and tools by having them in the custody of crew foremen overnight". The evidence does not sustain this contention. A substantial part of the equipment, including a two-ton truck, was left in the oil fields. The trucks were never parked in defendant's yard, but rather on the streets in front of the foremen's homes. There is no evidence that they were safer there than they would have been in the fields.

pose in using the trucks was for the transportation of the employees, and any use in hauling supplies and material for the customers was incidental to that primary use. As noted supra, all employees were paid whenever any hauling was done for the customers.

Defendant contends that it is not liable under the facts here presented by reason of the provisions of the Portal-to-Portal Act, 29 U.S.C. §§ 251–262, relying in particular upon Section 254(a), which reads in pertinent part:

"§ 254(a) * * * no employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, as amended * * * on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee * * *

"(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform * * *

"(2) activities which are preliminary to or post-liminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities."

Defendant argues that the principal activity of the foremen ceased when the work in the field ended and that the transportation of the crew back to town was a mere convenience to the employees and was not an incident to the principal activities for which the foremen were hired.[7] Consequently, it is argued that the defendant falls within the purview of

the above quoted portion of the Portal-to-Portal Act and is not liable for unpaid wages.

Walling v. Mid-Continent Pipe Line Co., 10 Cir., 1944, 143 F.2d 308, 310–311, is in most respects similar to the instant case. The court there described the facts as follows:

"Under the contract of employment, all of the employees in the maintenance department were required to report to the respective warehouses where the workday commenced. * * * they were paid for the time consumed in traveling to the place of performance, but the workday ended at the place of work, and they were not compensated for the return transportation time. Thirty-six laborers and one welder were free to return to their homes or the warehouses either on the company trucks or by any other means they chose. *It was however a part of the duties of five welders to drive company trucks containing men and equipment from the warehouses to the place of work, and when the workday was finished, return the trucks and equipment to the warehouses where they were relieved of their duties.* The return time averaged about one hour per day, for which they received no compensation." (Emphasis added.)

In holding that the drivers were entitled to compensation for the return trip, the court said:

"With respect to the thirty-six laborers and one welder who did not drive a truck, the trial court rightly held that since the day's work ended at the place of performance, they were not entitled to have the return time included in the workday or to be compensated therefor. * * * It

7. It was held in Steiner v. Mitchell, 1956, 350 U.S. 247, 255–256, 76 S.Ct. 330, 335, 100 L.Ed. 267, that activities performed either before or after the regular work shift "are compensable under the portal-to-portal provisions of the Fair Labor Standards Act if those activities are an

integral and indispensable part of the principal activities for which covered workmen are employed and are not specifically excluded by Section 4(a) (1)." (29 U.S.C. § 254(a) (1). See also Mitchell v. King Packing Co., 1956, 350 U.S. 260, 76 S.Ct. 337, 100 L.Ed. 282.

is equally plain however, as the trial court indicated but did not hold, that since the five welders were required to drive the company trucks and equipment from the place where the work was performed to the warehouses *before they were relieved of their duties,* they were legally entitled to have this transportation time included in their statutory workweek, and to be compensated therefor in accordance with the applicable provisions of the Fair Labor Standards Act * * *." (Emphasis added.)

29 CFR § 785.38 is indicative of the way in which the Walling case has been interpreted. The regulation there provides:

"Time spent by an employee in travel as part of his principal activity, such as travel from job site to job site during the workday, must be counted as hours worked. Where an employee is required to report at a meeting place to receive instructions or to perform other work there, or to pick up and to carry tools, the travel from the designated place to the work place is part of the day's work, and must be counted as hours worked regardless of contract, custom, or practice. If an employee normally finishes his work on the premises at 5 p. m. and is sent to another job which he finishes at 8 p. m. and is required to return to his employer's premises arriving at 9 p. m., all of the time is working time. *However, if the employee goes home instead of returning to his employer's premises, the travel after 8 p. m. is home-to-work travel and is not hours worked."* (Citing Walling v. Mid-

Continent Pipe Line Co.) (Emphasis added.)

In D A & S Oil Well Servicing, Inc. v. Mitchell, 10 Cir., 1958, 262 F.2d 552, the court held that truck drivers were entitled to compensation for the return trip on the ground that the pickups which transported the employees were also used to transport necessary equipment and accordingly constituted activities which were an "integral and indispensable part" of the principal activities of the employees doing the driving. The pickups in the past had been used only for transportation of employees, but at the time the action was brought, "employees, butane tanks, and other necessary equipment were transported by the pickups". (Footnote 2, p. 553 of 262 F.2d.) [8] The court noted that "if the trucks are used solely for the transportation of employees to and from their principal place of work, then, we think, the drivers are 'riding, or traveling' within the exclusion of Section 4 of the Act. The employer is under no obligation to furnish such transportation and it is provided only for the convenience of the employees. No employee is designated to drive the pickup. Each employee, including the driver, is free to take advantage of the convenience or to provide his own transportation." (262 F.2d at 555.)

As noted supra, there is no evidence here that any truck was ever returned to' the defendant's yard or premises at the close of the day's work. It is clear from Walling v. Mid-Continent and D A & S Oil Well Servicing, Inc. v. Mitchell that if the trucks were used solely for transportation of the crews, the foremen would not be entitled to the compensation claimed by plaintiff on their behalf.

**8.** The basis of the court's holding is explained further as follows: "It is true, as contended by the defendant, that driving a truck is a totally different type of activity from that performed by such driver-employee at the well site. But employees who transport equipment without which well servicing could not be done, are performing an activity which is

so closely related to the work which they and the other employees perform, that it must be considered an integral and indispensable part of their principal activities. As to the drivers of the pickup trucks, it is quite clear from the record that they are also transporting equipment without which the principal activities could not be performed." (262 F.2d at 555.)

Plaintiff suggests, however, that the oil fields were "several miles from the defendant's source of supply of machinery and parts"; and contends that the return trip "accomplished two essential things: transportation of the crews and the fueling of the tank, in addition to the protection of the trucks and their equipment and tools by having them in the custody of the crew foremen overnight".

There is no evidence that the trucks were used for the transportation of any necessary machinery, equipment, repairs or supplies which the defendant used in his work in the oil field, aside from the equipment and tools on each truck. There is no evidence that any of the tools or equipment were used en route or any place except in the oil field; nor is there any evidence that it was necessary to return the equipment and tools to town each night. Other trucks, machinery and equipment were left in the oil fields. I cannot find from the evidence that the trucks were returned to town for their protection and the protection of the equipment and tools mounted thereon.

There is likewise no evidence of any contractual obligation on the part of the defendant to haul materials and supplies to the customers. Admittedly on occasions, but not daily or even regularly, materials and supplies were hauled to the customer, at the customer's request, from the warehouses of the customers or their suppliers. This was clearly an accommodation to the customer. I cannot find from the evidence that this transportation for the customers was an "integral and indispensable part" of the principal activities of the foremen who did the driving. On rather rare occasions, materials and supplies were hauled for the customers from the oil field to town, and on these occasions all employees, including the foremen, were paid.

■ Under these circumstances, I conclude that plaintiff has failed to establish the claims asserted on behalf of the foremen drivers for compensation for the return trips.

This opinion will constitute findings of fact and conclusions of law, pursuant to Rule 52 of the Federal Rules of Civil Procedure; although counsel for defendant may, if they so desire, submit separate findings. Counsel for defendant, pursuant to Rule 11(b) of the local rules of court, will prepare, serve and lodge form of judgment.