STEINER et al., doing business as CUMBER-
LAND BATTERY MANUFACTURING CO., v.
MITCHELL, SECRETARY OF LABOR.

No. 22.   Argued November 16, 1955.—Decided January 30, 1956.

*Cecil Sims* argued the cause for petitioners.   With him
on the brief was *Louis Leftwich, Jr.*

*Bessie Margolin* argued the cause for respondent.   With
her on the brief were *Solicitor General Sobeloff, Ralph
S. Spritzer, Stuart Rothman* and *Sylvia S. Ellison.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

This case raises an issue of coverage under the Fair Labor Standards Act, as amended by the Portal-to-Portal Act of 1947, with respect to work performed before or after the direct or productive labor for which the worker is primarily paid.

The precise question is whether workers in a battery plant must be paid as a part of their "principal" activities for the time incident to changing clothes at the beginning of the shift and showering at the end, where they must make extensive use of dangerously caustic and toxic materials, and are compelled by circumstances, including vital considerations of health and hygiene, to change clothes and to shower in facilities which state law requires their employer to provide, or whether these activities are "preliminary" or "postliminary" within the meaning of the Portal-to-Portal Act and, therefore, not to be included in measuring the work time for which compensation is required under the Fair Labor Standards Act.

The Secretary of Labor, contending that these activities are so covered, brought this action in the United States District Court for the Middle District of Tennessee to enjoin petitioners from violating the overtime and record-keeping requirements of Sections 7 and 11 (c) of the Fair Labor Standards Act of 1938, as amended, in the employment of production workers, and from violating Section 15 (a)(1) of the Act by making interstate shipments of the goods produced by such workers.

The District Court gave judgment for the plaintiff, and the Court of Appeals for the Sixth Circuit affirmed. 215 F. 2d 171. Because of the importance of the interpretation of the portal-to-portal provisions in the administration of the Fair Labor Standards Act, and because of a conflict between the circuits on the subject, *Mitchell* v.

*King Packing Co.*, 216 F. 2d 618, we granted certiorari in both cases, 349 U. S. 914.

There is no question of back pay involved here because the Court limited its judgment to prospective relief. Nor is the question of changing clothes and showering under normal conditions involved because the Government concedes that these activities ordinarily constitute "preliminary" or "postliminary" activities excluded from compensable work time as contemplated in the Act. It contends, however, that such activities in the circumstances of this case are an integral and indispensable part of the production of batteries, the "principal activity" in which these employees were engaged, and are, therefore, compensable under the relevant provisions of the Act.

The petitioners own and operate a plant where they are engaged in manufacturing automotive-type wet storage batteries which they sell in interstate commerce. All of the production employees, such as those with whom we are here concerned, customarily work with or near the various chemicals used in the plant. These include lead metal, lead oxide, lead sulphate, lead peroxide, and sulphuric acid. Some of these are in liquid form; some are in powder form, and some are solid. In the manufacturing process, some of the materials go through various changes and give off dangerous fumes. Some are spilled or dropped, and thus become a part of the dust in the air. In general, the chemicals permeate the entire plant and everything and everyone in it. Lead and its compounds are toxic to human beings. Regular exposure to atmosphere containing 1.5 milligrams or more of lead per 10 cubic meters is regarded by the medical profession as hazardous and involving the possibility of lead intoxication or lead poisoning. In battery plants, such as this one, it is "almost impossible," it was testified, to keep lead concentration in the air "within absolutely safe limits," and in petitioners' plant "lead oxide was on the floor

and in the air and on the plates which employees handled." Abnormal concentrations of lead were discovered in the bodies of some of petitioners' employees, and petitioners' insurance doctor recommended that such employees be segregated from their customary duties. The primary ways in which lead poisoning is contracted are by inhalation and ingestion; i. e., by taking in particles through the nose or mouth, an open cut or sore, or any other body cavity. The risk is "very great" and even exists outside the plant because the lead dust and lead fumes which are prevalent in the plant attach themselves to the skin, clothing and hair of the employees. Even the families of battery workers may be placed in some danger if lead particles are brought home in the workers' clothing or shoes. Sulphuric acid in the plant is also a hazard. It is irritating to the skin and can cause severe burns. When the acid contacts clothing, it causes disintegration or rapid deterioration. Moreover, the effects of sulphuric acid make the employee more susceptible than he would otherwise be to contamination by particles of lead and lead compounds.

Petitioners, like other manufacturers, try to minimize these hazards by plant ventilation, but industrial and medical experts are in agreement that ventilation alone is not sufficient to avoid the dangers of lead poisoning. Safe operation also requires the removal of clothing and showering at the end of the work period. This has become a recognized part of industrial hygiene programs in the industry, and the state law of Tennessee requires facilities for this purpose. Tenn. Code Ann. (Williams 1934), 1952 Supp., Section 5788.15. In addition, the Tennessee Workmen's Compensation Act, Tenn. Code Ann. (Williams 1934), 1952 Supp., Sections 6851–6901, which covers petitioners, makes lead poisoning a compensable occupational disease (Section 6852 (d)). In order to comply with this statute, petitioners carry insurance, under Section 6895, to protect against liability, and

the insurance carrier would not accept the insurance risk if defendants refused to have showering and clothes-changing facilities for their employees.

Accordingly, in order to make their plant as safe a place as is possible under the circumstances and thereby increase the efficiency of its operation, petitioners have equipped it with shower facilities and a locker room with separate lockers for work and street clothing. Also, they furnish without charge old but clean work clothes which the employees wear. The cost of providing their own work clothing would be prohibitive for the employees, since the acid causes such rapid deterioration that the clothes sometimes last only a few days. Employees regularly change into work clothes before the beginning of the productive work period, and shower and change back at the end of that period.[1]

Petitioners issued no written instructions to employees on this subject, but the employees testified and the foreman declared in a signed statement that "In the afternoon the men are required by the company to take a bath because lead oxide might be absorbed into the blood stream. It protects the company and the employee both."

Petitioners do not record or pay for the time which their employees spend in these activities, which was found to amount to thirty minutes a day, ten minutes in the morning and twenty minutes in the afternoon, for each employee. They do not challenge the concurrent findings of the courts below that the clothes-changing and showering activities of the employees are indispensable to the performance of their productive work and integrally related thereto. They do contend that these activities fall without the concept of "principal activity" and that,

---

[1] The only exception was one injured employee who, because of the danger of infection to his wounded foot in a common shower, bathed at his home which is about five blocks from the plant.

being performed off the production line and before or after regular shift hours, they are beyond the protection of the Fair Labor Standards Act.

The trial court held that these activities "are made necessary by the nature of the work performed"; that they fulfill "mutual obligations" between petitioners and their employees; that they "directly benefit" petitioners in the operation of their business, and that they "are so closely related to other duties performed by [petitioners'] employees as to be an integral part thereof and are, therefore, included among the principal activities of said employees." It concluded that the time thereby consumed is not excluded from coverage by Section 4 of the Portal-to-Portal Act, but constitutes time worked within the meaning of the Fair Labor Standards Act. The Court of Appeals affirmed, likewise holding that the term "principal activity or activities" in Section 4 [2] embraces all

---

[2] "Sec. 4. . . .

"(a) Except as provided in subsection (b), no employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee engaged in on or after the date of the enactment of this Act—

"(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

"(2) activities which are preliminary to or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

"(b) Notwithstanding the provisions of subsection (a) which relieve an employer from liability and punishment with respect to an activity, the employer shall not be so relieved if such activity is compensable by either—

"(1) an express provision of a written or nonwritten contract in

activities which are "an integral and indispensable part of the principal activities," and that the activities in question fall within this category.

With this conclusion, we agree.

The Portal-to-Portal Act was designed primarily to meet an "existing emergency" resulting from claims which, if allowed in accordance with *Anderson* v. *Mt. Clemens Pottery Co.*, 328 U. S. 680, would have created "wholly unexpected liabilities, immense in amount and retroactive in operation." [3]   This purpose was fulfilled by the enactment of Section 2.[4]   The trial court specifically

---

effect, at the time of such activity, between such employee, his agent, or collective-bargaining representative and his employer; or

"(2) a custom or practice in effect, at the time of such activity, at the establishment or other place where such employee is employed, covering such activity, not inconsistent with a written or nonwritten contract, in effect at the time of such activity, between such employee, his agent, or collective-bargaining representative and his employer." 61 Stat. 86, 29 U. S. C. § 254.

[3] § 1 (a), 61 Stat. 84, 29 U. S. C. § 251 (a).

[4] "SEC. 2. . . .

"(a) No employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act (in any action or proceeding commenced prior to or on or after the date of the enactment of this Act [May 14, 1947]), on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any activity of an employee engaged in prior to the date of the enactment of this Act, except an activity which was compensable by either—

"(1) an express provision of a written or nonwritten contract in effect, at the time of such activity, between such employee, his agent, or collective-bargaining representative and his employer; or

"(2) a custom or practice in effect, at the time of such activity, at the establishment or other place where such employee was employed, covering such activity, not inconsistent with a written or nonwritten contract, in effect at the time of such activity, between such employee, his agent, or collective-bargaining representative and his employer." 61 Stat. 85, 29 U. S. C. § 252.

limited the effect of this judgment to services rendered after the judgment becomes final. We are not, therefore, concerned with the provisions of Section 2, which is inapplicable to actions relating to activities of employees performed after May 14, 1947.

The language of Section 4 is not free from ambiguity and the legislative history of the Portal-to-Portal Act becomes of importance. That Act originated in a House bill, which had no provision comparable to Section 4, but rather gave similar treatment to retroactive and prospective claims; i. e., excluding coverage except by contract or custom in the industry. H. R. Rep. No. 326, 80th Cong., 1st Sess. 12. The Conference Report stated that the language of Section 4 follows the Senate bill. S. Rep. No. 48, 80th Cong., 1st Sess. 48. In the Senate, the colloquy between several Senators and Senator Cooper, a sponsor of the bill and a member of the three-man subcommittee that held hearings for the Committee on the Judiciary which reported it, demonstrates that the Senate intended the activities of changing clothes and showering to be within the protection of the Act if they are an integral part of and are essential to the principal activities of the employees.[5]

There is some conflicting history in the House,[6] but the Senate discussion is more clear cut and, because the Section originated in that body, is more persuasive.

In 1949, Section 3 (o) was added to the Act.[7] Both sides apparently take comfort from it, but the position

---

[5] See the colloquy quoted in an appendix to this opinion, *post*, p. 256.

[6] See Remarks of Representative Gwynne, 93 Cong. Rec. 4388–4389; Remarks of Representative Walter, *id.*, at 4389; Remarks of Representative Michener, *ibid.*

[7] "SEC. 3 (o). Hours Worked.—In determining for the purposes of sections 6 and 7 the hours for which an employee is employed, there shall be excluded any time spent in changing clothes or washing at

of the Government is strengthened by it since its clear implication is that clothes changing and washing, which are otherwise a part of the principal activity, may be expressly excluded from coverage by agreement. The congressional understanding of the scope of Section 4 is further marked by the fact that the Congress also enacted Section 16 (c) [8] at the same time, after hearing from the Administrator his outstanding interpretation of the coverage of certain preparatory activities closely related to the principal activity and indispensable to its performance.[9]

On the whole it is clear, we think, that while Congress intended to outlaw claims prior to 1947 for wages based on all employee activities unless provided for by contract or custom of the industry, including, of course, activities performed before or after regular hours of work, it did not intend to deprive employees of the benefits of the Fair Labor Standards Act where they are an integral part of and indispensable to their principal activities. Had Congress intended the result urged by petitioner, the

---

the beginning or end of each workday which was excluded from measured working time during the week involved by the express terms of or by custom or practice under a bona fide collective-bargaining agreement applicable to the particular employee." 63 Stat. 911, 29 U. S. C. § 203 (o).

[8] "SEC. 16 (c). Any order, regulation, or interpretation of the Administrator of the Wage and Hour Division or of the Secretary of Labor, and any agreement entered into by the Administrator or the Secretary, in effect under the provisions of the Fair Labor Standards Act of 1938, as amended, on the effective date of this Act, shall remain in effect as an order, regulation, interpretation, or agreement of the Administrator or the Secretary, as the case may be, pursuant to this Act, except to the extent that any such order, regulation, interpretation, or agreement may be inconsistent with the provisions of this Act, or may from time to time be amended, modified, or rescinded by the Administrator or the Secretary, as the case may be, in accordance with the provisions of this Act." 63 Stat. 920.

[9] 29 CFR § 790.8.

very different provisions of Sections 2 and 4 would have been unnecessary; Section 2 could have been given prospective as well as retroactive effect.

We, therefore, conclude that activities performed either before or after the regular work shift, on or off the production line, are compensable under the portal-to-portal provisions of the Fair Labor Standards Act if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed and are not specifically excluded by Section 4 (a)(1).

We find no difficulty in fitting the facts of this case to that conclusion because it would be difficult to conjure up an instance where changing clothes and showering are more clearly an integral and indispensable part of the principal activity of the employment than in the case of these employees.

The judgment is

*Affirmed.*

## APPENDIX TO OPINION OF THE COURT.

*Colloquy Between Senator Cooper and Other Senators.*

"Mr. COOPER. . . . Before the enactment of the Fair Labor Standards Act an employee might have worked upon a lathe under a contract, and his contract may have provided that his pay should commence at a scheduled hour, say at 7 o'clock when the lathe began to run, and he began to apply his energy to a casting or to a block upon the lathe. After the enactment of the Fair Labor Standards Act, by interpretations of the Wage and Hour Administrator, it was held that certain preparatory activities such as sharpening the tools, oiling the machinery, preparing his machinery for work, were so closely related to his productive activity that the employer must compensate the employee for it. We believe that in the use of the words 'principal activity' we have preserved to the employee the rights and the benefits and the privileges which have been given to him under the Fair Labor Standards Act, because it is our opinion

that those activities which are so closely related and are an integral part of the principal activity, indispensable to its performance, must be included in the concept of principal activity. And to make our position clear we have given examples in the report. . . .

"Mr. McGRATH. I think that at this point we might very definitely make contribution to the legislative history of what we are doing here. Am I correct in understanding the Senator to say that what the majority of the committee proposes is that any activity of a worker shall be considered a part of his principal activity if the doing of that act is indispensable to the performance of the rest of his day's work?

"Mr. COOPER. I can read the language used in the report, and I think that language should be used in this connection, because the words and phrases it employs were adopted by the committee. On page 48 of the report, in the definition of 'principal activity,' we find these words:

" 'It will be observed that the particular time at which the employee commences his principal activity or activities and ceases his principal activity or activities marked the beginning and the end of his workday. The term "principal activity or activities" includes all activities which are an integral part thereof as illustrated by the following examples:

" '1. In connection with the operation of a lathe an employee will frequently at the commencement of his workday oil, grease, or clean his machine, or install a new cutting tool. Such activities are an integral part of the principal activity, and are included within such term.

" '2. In the case of a garment worker in a textile mill, who is required to report 30 minutes before other employees report to commence their principal activities, and who during such 30 minutes distributes clothing or parts of clothing at the workbenches of other employees and gets machines in readiness for operation by other employees, such activities are among the principal activities of such employee.'

"We believe that our bill provides that the employee must receive compensation for such activities.

.        .        .        .        .

"Mr. McGRATH. . . . Then we can clear that point up by reiterating that what the committee means is that any amount of time spent in the performance of the type of activity expressed in examples 1 and 2 is to be hereafter regarded as compensable time.

"Mr. COOPER. I should certainly say so, as a part of the principal activity.

"Mr. McGRATH. There are innumerable instances of operations which have to be performed that are not covered in these two particular examples. I think of one at the moment. In certain of our chemical plants workers are required to put on special clothing and to take off their clothing at the end of the workday, and in some of the plants they are required to take shower baths before they leave. Does the Senator regard such activity as that as coming within the compensable workday?

"Mr. COOPER. I am very happy that the Senator has asked the question, because I believe it gives the opportunity of drawing a fine distinction between the type of activity which we consider compensable and the type which should not be compensable. In accordance with our intention as to the definition of 'principal activity,' if the employee could not perform his activity without putting on certain clothes, then the time used in changing into those clothes would be compensable as part of his principal activity. On the other hand, if changing clothes were merely a convenience to the employee and not directly related to the specific work, it would not be considered a part of his principal activity, and it follows that such time would not be compensable." 93 Cong. Rec. 2297–2298.

.           .           .           .           .

"Mr. BARKLEY. . . . Suppose that a man is a machinist or a mechanic of some kind. He is required to go to work at 8 o'clock. Let us assume for a moment that he is not a member of an organization. He is required to enter upon the actual labor, which might be termed his principal employment, at 8 o'clock in the morning and to spend 8 hours at such principal employment. But let us suppose that his employer requires him to be on the grounds and within the shop at 7:30 in the morning in order that he may spend half an hour sharpening and preparing the tools with which he himself or his colleagues in the factory are to work. Can anybody say that under those circumstances the 40-hour workweek has been complied with, as intended by the Fair Labor Standards Act? If he is required to do that every day, instead of working 8 hours a day he will be working 8½ hours a day. If he works 6 days a week, instead of 40 hours a week, he will be working more than 50 hours, every moment of which he is under the control of his employer, working with tools which belong to his employer, and he must abide by his orders or run the risk of discharge from his employment.

"Is that a part of his principal employment, or is that preliminary; or, if he is required to do it after the close of the shop in the afternoon, is that a part of the 'postliminary' work for which there is to be no compensation unless there is a contract or unless it has been the practice and custom for the employer to pay for the extra work done at his command?

.          .          .          .          .                    .

"Mr. COOPER. The distinguished Senator has perhaps not had the opportunity to read the report of the committee. Let me say that on page 48 of the report of the committee that exact situation, or one as nearly comparable to it as probably could be cited, is discussed. In the report it is clearly stated that under such circumstances it is the intention of the framers of the bill that such activities shall be compensable, as a part of the principal activity." 93 Cong. Rec. 2350.