Robert B. REICH, Secretary of Labor,
United States Department of
Labor, Plaintiff,

v.

**NEW YORK CITY TRANSIT
AUTHORITY, A Corporation,
Defendant.**

No. CV 89–4284.

United States District Court,
E.D. New York.

Dec. 13, 1993.

Patricia M. Rodenhausen, Regional Solicitor, U.S. Dept. of Labor, New York City, Judith E. Kramer, Deputy Solicitor of Labor, (Louis De Bernardo and Harold W. Lemar, Attys., of counsel).

Proskauer, Rose, Goetz & Mendelsohn, New York City (Myron D. Rumeld and Neil Howard Abramson, of counsel).

## OPINION AND ORDER

SPATT, District Judge.

This is an action by the Secretary of Labor ("the Secretary") brought pursuant to the Fair Labor Standards Act of 1938, as amended (29 U.S.C. § 201 et seq.) ("FLSA") to enjoin the defendant New York City Transit Authority ("TA") from violating the provisions of the FLSA with regard to the transportation of canines ("canines" or "dogs") by the New York City Transit Authority Police Department ("TAPD") Canine Unit.

The issue is whether the hours spent traveling from the police officer dog handler's home to the place of work and the return trip to the home of the handler transporting a canine of the TAPD, constitutes compensable hours under the FLSA and the Regulations promulgated under the FLSA (29 C.F.R. 785 and 29 C.F.R. 790.7[d]).

## BACKGROUND

The defendant TA is a public benefit corporation engaged in the operation of transportation units in the City of New York including the subway system. The New York City Transit Authority Police Department is the police and law enforcement arm of the TA. With regard to the issues in this case, the TA admits it is an employer within the meaning of Section 3(d) of the FLSA (29 U.S.C. § 203[d]); it is an enterprise within the meaning of Section 3(r) (29 U.S.C. § 203[r][1]; and it employs "certain employ-

ees" within the meaning of Section 3(s)(6) (29 U.S.C. § 203[s][6]) of the Act.

The TAPD contains a canine unit first established in 1980. The canine unit consists of police officers known as "handlers" and the canines. These TAPD police dog handlers patrol the New York City subway system accompanied by male German Shepherd dogs weighing between 75 to 110 pounds. The canine teams are used to deter criminal activity and assist in the detection and prevention of crimes.

The police canine handlers are solely responsible for the care of the dogs assigned to them. They are required to personally transport the dogs and to personally care for the dogs at their homes. Their categorical mandate is to transport the dogs in their motor vehicles and not by public transportation. The TAPD handlers solely transport, feed, care for and train their police dogs.

In a partial consent order approved by the Court in April 25, 1992, the parties settled all claims for uncompensated dog care duties and travel time for the period preceding October 15, 1990. In this consent order the parties also settled all claims for dog care duties performed at their homes for certain handlers for the period prior to the filing of the stipulation. Moreover, the parties consented to reserve for trial certain issues for the period commencing October 15, 1990, including the following:

"(A) Whether the hours spent traveling from the handler's home to his/her place of work and return, transporting a canine to be utilized by the Canine Unit of the New York City Transit Authority Police Department constitutes hours worked compensable under the Act and regulations found at 29 C.F.R. 785 and 29 C.F.R. 790.7(d);

(B) Whether the defendant violated sections 7 and 15(a)(2) of the Act by failing to pay for the activity described in (A) above;

. . . .

(G) Whether, in the event plaintiff prevails with respect to the issue set forth in (A) above, plaintiff is entitled to a permanent injunction enjoining defendant from future violations of the Act pursuant to § 17 of the Act with respect to employees

of the Canine Unit of the New York Transit Authority Police Department."

The Court bifurcated the trial so as to try liability and the plaintiff's request for injunctive relief, and reserved the issue of damages, if necessary, to a later date.

## CONTENTIONS

The plaintiff Secretary contends that the TAPD canine handlers are entitled, under the law and regulations, to overtime wages for the time spent traveling from the handler's home to his/her place of work and the return trip transporting the canine. The Secretary further states that such travel time is compensable within the purview of the Fair Labor Standards Act and the Regulations at 29 C.F.R. Parts 785 and 790 (1993). Stated simply, the Secretary claims that the TAPD canine handlers should be compensated for their home-to-work-and return to home travel time while transporting the canines.

On the other hand, the defendant contends that the handlers' travel time is not compensable merely because they are accompanied by the dogs. The defendant further asserts that the Department of Labor ("DOL") claim is barred by Section 4(a)(1) of the Portal–to–Portal Act. In addition, the defendant argues that the handlers' travel time is not compensable under an "integral and indispensable" analogy or as "travel between principal activity job sites."

## THE TRIAL—FINDINGS OF FACT

This opinion and order includes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a) (see also Colonial Exchange Ltd. Partnership v. Continental Casualty, 923 F.2d 257 [2d Cir.1991]).

During this discussion, the Court will make findings of fact which will be supplemented by additional findings later in the opinion.

The trial counsel for the defendant was substantially correct when he said in his opening statement that "this case is almost entirely, if not exclusively, legal" (Tr. at p. 5). The testimony adduced by the twenty witnesses, including the nineteen dog handlers who testified, was enlightening to the Court on the duties and responsibilities of a dog handler, and, in particular, with regard to their canine transportation duties. However, the facts with regard to the compulsory transportation of the dogs by the handlers' motor vehicles, and the occurrences on such car rides with the dogs are essentially undisputed.

## THE PLAINTIFF'S CASE

In fairly typical testimony, JOHN BENINTENDO, a sergeant in the TAPD, volunteered for the newly organized Canine Unit in 1980. He was a handler, assistant trainer and Director of training. A handler patrols the subways and other TA areas with his canine to deter crime, arrest suspects, search buildings and other duties. It is necessary for the handlers to take their dogs home to be fed and otherwise cared for. It is the sole responsibility of the handler to transport by car, feed, house and care for his or her dog. The object of the sole responsibility by the handler in transporting and caring for the dog is to create a bond between the handler and the dog.

The dogs, all male German Shepherds, are given aggression training, are taught to bite culprits, obedience to the handler and to respond to threats to their handlers. While it may be a strange use of the term to a lay person, most of the TAPD dog handlers, considered their dog to be a "tool" as well as a pet. In another unusual concept, they likened the transportation of their dog as a tool, to the carrying of their gun.

There is a single reporting place for the handlers and their dogs; the Brooklyn Army Terminal ("Terminal" or "BAT"). All the dog handlers are instructed that the dogs must be transported to and from work by car and not by public transportation. Significantly, if a handler is sick and unable to work, another police officer is sent to the handler's home to transport the dog to the Terminal by car. That person is paid for traveling time (see Tr. p. 42).

As to the transportation of the dog in the handler's car, it is the responsibility of the handler to tend to the dog during the trip. The vicissitudes of a trip by car with the

German Shepard dog trained to be aggressive, consumed most of the trial time. In a fairly common experience, Sgt. Benintendo testified as follows:

"Q During training did you communicate to the handlers that they had any type of responsibility toward the canine during transporting that dog to and from work?

A Yes. That he should be attended to even in the car. He needs water in the car also, if it is a long ride home, he may have to stop the car, walk the dog. He may have to drive a little more defensively, when you have a volatile object in the back of the car.

. . . .

Q Do you have an opinion as to while the handler transports the dog to and from work as to where the handler's direction—attention is directed?

A It is two phased. He has to keep track of the road, that's natural. And he should be aware of what the canine is doing.

Q Under what circumstances would the handler have to interact or do something to the canine, to the dog?

A Well, if he started panting and being restless, it is a behavior sign of the dog being in some stressful situation, maybe he has to be walked or he is going to throw up or whatever. And he should investigate the further.

Q Have you been aware of situations where the canine has thrown up in the car?

A Yes, my assigned canine has thrown up in the car many times.

Q Is this something that would acquire (sic) immediate attention?

A Yes. The well-being of the dog is always immediate, and secondary is driving the rest of the trip with that unwarranted objects and feces and vomit in the car. You have to take care of that, too, treat it out" (Tr. at pp. 45, 51–51).

Sgt. Benintendo was of the opinion that the handler's social activity after work is diminished because the handler has to take the dog directly home.

A common trait with regard to all the dog handler witnesses is that they love dogs. The handlers are permitted to "adopt" the dogs after the canines reach retirement age. The Court finds that these special members of the TAPD accept the canine assignments because they want to work with dogs and know that, after a number of years, they will acquire a valuable pet.

The TA pays for many of the dog expenses, including food, veterinary treatment and parking fees. At the inception of their assignment, each TAPD dog handler was advised that there would be no travel time compensation and they willingly accepted the duty without such compensation. Further, the union contract governing the TAPD does not require that the canine handlers be compensated for travel time and such compensation has never been paid.

The Court finds that the usual transportation of the dogs to and from work is affected by the presence of the dog when the dog becomes sick or unruly. For example, Sgt. Benintendo testified that he had to stop his car and walk his dog on more than twenty occasions a year.

KEITH SAINTEN, another TAPD dog handler, testified that while transporting his dog, the animal is kept in the back seat. This is apparently the uniform method of traveling with the canine in the car. Sainten's dog, who weighs 75 to 80 pounds, reacts to people who approach his car, as follows:

"Q And I believe you testified that Pete's reaction to windshield washers, prostitutes, kids or someone else who approaches the car; is that correct?

A Yes.

Q And how does he react?

A He would be barking at them. He would jump up and bark at them, lunges toward them.

Q Do you take corrective action?

A Yes.

Q How do you do that?

A I have to hold him. If he sees a dog he goes after them also. And I have to hold him.

Q Has he ever seen a dog or someone out the front windshield?

A Yes.

Q And what does (sic) they do then?

A Lunges toward the front of the car.

Q What do you do then?

A Grab him and hold it back.

. . . .

Q Have you ever had to stop your vehicle when you are transporting people (sic)?

A Yes.

Q And what were the circumstances, if you can, would you tell us.

A Usually in the summertime, sometimes I feel he may need water, he starts panting or something. And he may want to be exercised, he starts whining and I see his tail is standing up or something. And I pull to the side.

Q Has he thrown up while transporting him?

A Yes.

Q And what do you do when he throws up?

A I carry towels in the car, and I clean it up.

Q You stop the vehicle to clean it up?

A Yes" (Tr. at pp. 140–142).

Sainten testified that while taking "Pete" to work doesn't increase the time of his commute, in the summer "he can be a burden in the car."

MICHAEL D. BARROW has been in the Canine Unit since September 1984. His dog is a 100 pound German Shepherd. He related his experience in transporting the dog, as follows:

"Q Could you describe to us the trip you make to work transporting Champ?

A Transporting the canine, depending on traffic conditions, and the dog's state of mind, traveling to work, he is usually in an excited state.

Q Does he ever stand up?

A He stands up quite often, constantly.

Q Where is he in the vehicle?

A Seated in the back seat of my car. I have a two-door car.

. . . .

Q Would there be any occasion where you have to stop your vehicle in the transport?

A There have been occasions when I have to, when I sit in traffic for an inordinate amount of time, and he is crying to go and I have to pull over or exercise him or relieve him. When he is throwing up I have to pull over and let him throw up outside the car.

. . . .

Q Does Champ react to anything outside of your vehicle while you are transporting him?

A Constantly.

Q What does he react to?

A If eye contact with another person in another vehicle, he sees, he instantly starts barking and getting aggressive.

. . . .

Q With respect to taking corrective measures, would there be any problem of letting Champ or when you had Bandit, to let them bark the whole route?

A You are not allowed to let that happen.

Q Why not?

A Too much of a distraction driving from our own personal safety, and it is not good for the dog to be constantly in that aggressive mode" (Tr. at pp. 182–185, 190).

On the other hand, Barrow testified that he did not expect to be compensated for travel time; he rarely has to stop to relieve the dog; and he generally can discipline his dog in the car by verbal commands.

JOHN HANSEN entered the Canine Unit in 1986. Hansen testified that while transporting his dog, if there is traffic, the dog gets agitated and starts barking. Also, people on the street cause the dog to be agitated. He drives and watches the dog at the same time.

"Q You testified you have the windows open slightly, approximately an inch and a half you said. Why not more?

A He can't jump out and nobody can put the hand in there.

. . . .

Q Can you describe for us how hard or easy it was to transport King to and from work?

A    Well, some days it might be easy and some days harder. It depends on like traffic, or if stopped at a light somebody runs across, or noise, and I would be jumping up and down. My old car, he ripped the back seat in my old car. Some days it would be easy and some days hard" (Tr. at pp. 204–207).

However, Hansen said that his commuting time is increased no more than five to ten minutes and it is rare for him to have to pull the car over.

Dog handler KENNETH YULE explained how he was trained by Lieutenant Galfano, presently the commander of the Canine Unit, as follows:

"Q    And did he tell you anything during the interview about the canine unit?

A    Yes. He told us the responsibilities, that the dog is to be considered like your gun, and that it is a twenty-four hour a day responsibility, and anything that happens, it is your fault and you will be held liable.

Q    Did he mention anything about transporting the dog?

A    Yes. He said you would need your own car to transport the dog to and from" (Tr. at p. 235).

It takes handler Yule an hour and a half each way to commute with his dog. He described the average trip:

"Q    Could you describe to us the transporting your dog back and forth?

A    I place him in the back seat, and place the lead through the door and tie it in a knot so he doesn't move around too much.

Q    Can you describe what happens in transporting?

A    We get in the car and we start driving. He is constantly—you know, you are constantly watching him, watching the road. It is work. It doesn't end. It is nonstop. Once he gets in the car, until I get to work, until I get home again, he is constantly moving around, barking, standing up.

. . . .

Q    And do you utilize the rear-view mirror?

A    When he stands up it's a major problem because he is so big he blocks the whole mirror. And by that time now as you are driving along, you are looking behind at him, trying to pull him down, down, and looking at the roads. It is a real pain in the neck" (Tr. at pp. 236–239).

Although, his trip with his dog is sometimes disturbing, there is generally no increase in travel time except when Yule has to stop the car, which occurred ten to twelve times in two and a half years, resulting in a ten minute increase in travel time. Yule considers his dog to be a "tool" at work but not at home.

FRANK VOLLARO has been a dog handler in the TAPD for more than seven years. While he states his dog is a "tool," his wife and daughter treat the dog like a pet. Vollaro's commute is not burdensome and he didn't expect to be paid for his travel time. The family of handler CHRISTOPHER REGGI also treat his dog as a pet, even though he equated his dog with his gun in that he is responsible for both on a twenty-four hour basis. Handler JAMES JOYCE considers transporting his dog to be a significant responsibility. However, his travel time is not increased by having the dog since he never stops enroute.

HOWARD SILVERSTEIN was in the Canine Unit for five years. He considers his dog to be a "tool" and a "partner". Enroute in the car if people approached, he barked. His dog Buddy was aggressive at home, growled at his wife and bit Silverstein on several occasions. Buddy was not adopted and was destroyed. His commuting time was no longer except in the summer by only five minutes.

EDWARD ULMER has been in the Canine Unit for eight years and is now a trainer. He testified as to his instructions to the dog handlers while training them, as follows:

"Q    And what do you instruct new handlers?

A    New handlers are instructed from day one, that these dogs—that these dogs are not—they are not your average family pet; that there is a lot of responsibility in handling one of these dogs. They are—they are another tool like your gun, and you have to be aware of the dog's presence at

all times. And anything that dog does is your responsibility.

Q Do you instruct them in any way as to whether or not they can leave the dog alone in the car?

A The dog is not supposed to be left alone in the car at any time.

Yes, we do instruct them to do that.

Q Is there any instruction given to the new handlers regarding whether they can have someone else perform their duties of caring for the dog?

A Yes. They are instructed that this dog is their sole responsibility, and that it is no one else's responsibility in their family to walk this dog, feed this dog, or groom this dog" (Tr. at pp. 443, 444).

## THE DEFENDANT'S CASE

Lieutenant BARRY GALFANO was in the TAPD Canine Unit from 1983 to 1987. He was a canine handler and trainer. He is presently the Commander of the Canine Unit. Lt. Galfano owned German Shepherds all of his life and has a fondness for dogs. He was advised that he would be responsible for transporting his dog in his car and, that he would not be compensated for such travel time and did not expect to be paid for such time.

Lt. Galfano retired his dog "Harry," adopted the dog and he is now a pet at his home. Lt. Galfano testified that the dog was a family pet even during his canine service. He enjoyed having his own dog and that it was not "inconvenient." During his service, Lt. Galfano overheard four or five "incidents" while transporting his dog. Also, during his journeys to and from work with his dog, he made stops for personal errands while the dog remained in the car. Further, he stated that his commuting time and distance was not increased by having his dog in the car. While he considered the dog to be a "tool" while involved in police activity, this was not true of the activities of the dog at home.

However, Lt. Galfano conceded that sometimes his dog became agitated while being transported and would bark. He further stated that his dog was a "tool" while on patrol. Further, if the need arose while transporting his dog, he would be a "working dog." He agreed that transporting "Harry" was an important duty.

FRANCES MILBERG formerly was the Deputy Director and General Counsel of the office of Labor Relations of the City of New York. She was a member of the negotiating team for contracts with City employees. Ms. Milberg is familiar with the collective bargaining agreements with the TAPD. She testified about the "generous overtime pay" for TA police officers for more than forty hours of work per week.

The collective bargaining agreements do not provide for overtime compensation for the travel time of the canine handler to and from work. Nor is there such provision in the New York City Police Department ("NYCPD") collective bargaining agreement. She was involved in negotiation between the NYCPD and TAPD Unions, the TA, the NYCPD and the Department of Labor. The City of New York took the position that the canine officers should not be compensated for travel time. "They felt it was a windfall, (and) unfair because the City was encouraging its police officers to live within the city limits." This was communicated to Henry Szablicki, an investigator in the Wage & Hour Division of the U.S. Department of Labor. When the collective bargaining agreements with the NYCPD and the TAPD, which did not provide for compensation for travel time were consummated, the Department of Labor apparently did not pursue the matter of travel pay with regard to the NYCPD, as they are now doing in regard to the TAPD.

However, Ms. Milberg received a letter from Thomas Kelly, District Director of the U.S. Department of Labor, and Szablicki's superior, dated November 8, 1990 (Plf's Exh. 63) which reads as follows:

"Dear Ms. Milberg:

This will confirm our telephone conversation on Wednesday, November 7, 1990 regarding the issue of home-to-work travel for police officers in the New York City Canine Unit.

As I explained, the position of the Department of Labor is that any time spent by a

police officer transporting a dog between the work site and home or home and the work site must be considered as hours worked, and compensated as required by the FLSA of 1938, as amended (29 U.S.C. Sec. 201, *et seq.*)."

WILLIAM McNAUGHTON was a canine handler for eight years. He likes dogs and that is why he applied for this duty. His wife and two sons have a good relationship with his dog "Sam." The children, fifteen years and four years of age play with Sam. McNaughton lives in Centereach in Suffolk County and enjoys the company of Sam on his trip to and from Brooklyn. The dog does not distract him on the trip and his commutation time is not increased. McNaughton feels no additional compensation for travel time is necessary; the home care compensation is sufficient.

However, on cross-examination, McNaughton testified that Sam was his "partner" and his "tool." In fact, he related that the "tool" concept is in the Canine Handler's Guide. On the trips to and from Centereach, on occasion Sam, who weighs 105 pounds, tried to bite the service station attendants, has vomited in the car and barks in the car "all the time" (Tr. at p. 478). He barks so much that McNaughton "can't hear the radio" (Tr. at p. 479). Also, during the trip Sam tries to get in the front seat "all the time" (Tr. at p. 479).

CHERYL CAPERS has been a canine handler for six years. She loves dogs and her canine "Wolf" is well behaved and her travel time with him is not burdensome or lengthened. On her commuting with Wolf, her attention is sometimes diverted and she is distracted by his barking but only for "a few seconds." However, she also reiterated what almost every other canine handler said, namely, that Wolf is "always a tool to me" and he is also "my partner." Ms. Capers also conceded that she rarely leaves Wolf unattended in her car and that he ripped up the back seat of her car and broke a panel.

1. Pub.L. No. 49, 80th Cong., 1st Sess (May 14, 1947), 61 Stat. 84 (codified as amended at 29

## ADDITIONAL FINDINGS

1. The dog handlers do consider their dogs to be a "tool" similar to their gun.

1. Despite the "tool" concept, the Court finds that these handlers like to work with dogs and generally treat the dogs as "pets" while the dogs are home. The Court finds that the dogs are considered both a "tool" and a "pet."

3. Transporting the dogs to and from the job creates definite problems to the handlers, such as the dogs barking, leaping into front seats, vomiting, inability to stop for personal business and causing damage to the rear seat area.

4. On their own time, in connection with the transportation of their dog, the canine handlers must clean the interior of their car; clean dog vomit and feces in the interior of their car; and repair damage done by the dog to the interior of their car.

5. Despite the problems involved in transporting the dogs, the handlers' commuting time is generally not substantially increased.

6. Reviewing all of the facts in this case, the Court finds that the usual transportation of the dogs to and from work by car *is* adversely affected by the presence of the dogs in that they do become sick or unruly, damage the cars and do restrict the personal activity of the handlers.

## DISCUSSION

1. *Statutory and Regulatory Overview.*

The Fair Labor Standards Act of 1934 requires employers to compensate employees for all hours worked. 29 U.S.C. § 206. When an employee works for more than forty hours per week, they must be compensated at a rate one and a half times their wage rate. 29 U.S.C. § 207. An employer who fails to do so is subject to liability and punishment under the FLSA. 29 U.S.C. § 216.

In 1947, Congress amended the FLSA by enacting the Portal–to–Portal Act ("Act").[1] The primary purpose of the Act was to pro-

U.S.C. §§ 251–262).

vide relief to employers who were subject to increasing liabilities and labor costs on account of an ever-broadening judicial definition of what was considered compensable work under the FLSA. *Steiner v. Mitchell,* 350 U.S. 247, 253, 76 S.Ct. 330, 334, 100 L.Ed. 267 (1956). The Act provides that certain activities engaged in by an employee are not considered work, and, therefore, not compensable. These activities are described as:

> "(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
>
> (2) activities which are preliminary to or postliminary to said principal activity or activities,
>
> which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities" 29 U.S.C. § 254(a).

The Act excludes from the scope of the above described non-compensable activities, any such activities made compensable by reason of a contract, practice or custom in effect at the work establishment. 29 U.S.C. § 254(b). Since in this case there is no contract, custom or practice in effect that covers the transportation of the canines by the dog handlers, this latter part of the statute is not in issue.

■ The only preliminary or postliminary activities that the statute expressly defines are "walking, riding, or traveling to and from the actual place of performance of the principal activity." 29 C.F.R. § 790.7(b). However, not all such "walking, riding, or traveling," is non-compensable. If an employee engages in an activity that is considered a "principal activity" while traveling, that time is compensable. This conclusion can be inferred from the language of the statute, and is made abundantly clear from the regulatory interpretation and legislative history of the statute. For example, the regulations promulgated pursuant to the statute state:

> "[a]n employee who walks, rides or otherwise travels while performing *active* duties

is not engaged in the activities described in section [254(a)]. An illustration of such travel would be the carrying by a logger of a portable power saw or other heavy equipment (as distinguished from ordinary handtools) on his trip into the woods to the cutting area. In such a situation, the walking, riding, or traveling *is not segregable* from the simultaneous performance of his assigned work (the carrying of the equipment, etc.) and it does not constitute travel "to and from the actual place of performance" of the principal activities he is employed to perform." 29 C.F.R. § 790.7(d) (emphasis added).

*See also* 29 C.F.R. § 790.7(d) n. 47 (citing the following comments of Senator Cooper, sponsor of the Senate bill and Conference Committee floor manager for the Senate: "We have clearly eliminated from compensation walking, traveling, riding, and other activities not an integral part of the employment for which the worker is employe[d]."); 29 C.F.R. § 790.7(h) (an activity which is preliminary or postliminary in one set of circumstances, may be a principal activity in other circumstances); 29 C.F.R. § 785.41 ("Any work which an employee is *required* to perform while traveling must, of course, be counted as hours worked.") (emphasis supplied).

Accordingly, if transportation of the canine by the dog handler from the home to the BAT, and the return trip, is considered a "principal activity," then such an activity is outside the ambit of the Act's exclusion of compensation for "walking, riding or traveling" to work, and is, instead, compensable.

## 2. *Principal Activities.*

The Portal-to-Portal Act does not define what constitutes a "principal activity," or a "preliminary or postliminary activity." Rather, because of the fact-specific nature of the activities potentially encompassed by the terms, the Act leaves it to the administrative agencies and the courts to define which work activities fall within the scope of either term. *See e.g.,* S.Rep. No. 48, 80th Cong., 1st Sess. 47–48 (1947) (Section 254 "does not attempt to define what constitutes work.... This

section does not attempt to cover by specific language the many thousands of situations that do not readily fall within the pattern of ordinary workday."); 12 F.R. 7655, 7658 (Nov. 18, 1947) (a categorical list of "preliminary" or "postliminary" activities cannot be made, since such activities may in other circumstances be "principal activities.").

In *Steiner v. Mitchell, supra,* the United States Supreme Court considered whether the pre work and post work changing of clothes and showers by workers at a battery factory, who did so in order to protect themselves from potentially hazardous materials, were compensable under the FLSA. In allowing compensation, the court held that a principal activity "includes all activities that are integral and indispensable to the principal activity." *Id.* 350 U.S. at 256, 76 S.Ct. at 335; *accord* 29 C.F.R. § 790.8(b). Agreeing with the Court of Appeals, the *Steiner* court stated that activities which are integral and indispensable to the principal activity consist of the following elements:

"[they] are made necessary by the nature of the work performed;" that they fulfill "mutual obligations between the [employers] and their employees; that they "directly benefit" [the employers] in the operation of their business, and that they "are so closely related to other duties performed by [the] employees as to be an integral part thereof...." 350 U.S. at 252, 76 S.Ct. at 333 (quoting 215 F.2d 171, 172 (6th Cir.1954).

*Accord Dunlop v. City Elec., Inc.,* 527 F.2d 394, 401 (5th Cir.1976) (test for determining whether an activity is a principal activity, or an integral and indispensable part of such an activity, is "whether the activities are performed as part of the regular work of the employees in the ordinary course of business," and are performed for benefit of employer).

■ The integral and indispensable activities may take place before or after an employee's work hours. *Steiner,* 350 U.S. at 256, 76 S.Ct. at 335. Moreover, such activities need not predominate over all the other activities in order to be considered principal activities. *Dunlop,* 527 F.2d at 400–01. The fact that the activities are performed voluntarily is not determinative of whether they are principal activities or not. *See* 29 C.F.R. § 785.11 (compensable work includes voluntary work).

■ In contrast to an integral and indispensable activity, preliminary or postliminary activities are such actions spent predominantly in the employees own interest, and are "undertaken for the [employees] own convenience, not being required by the employer and not being necessary for the performance of their duties." *Dunlop,* 527 F.2d at 398.

The plaintiff Secretary in this case argues that transporting the canines to and from work is a compensable activity under the FLSA. The basis of his argument is that the activity is integral and indispensable to the primary activity of handling canines. By way of analogy, the Secretary asserts that the dog handler's situation is similar to that of a worker transporting a vital tool to the work site. *See, e.g., Crenshaw v. Quarles Drilling Corp.,* 798 F.2d 1345 (10th Cir.1986); 29 C.F.R. § 790.7(d).

The defendant disagrees, and argues that transporting the canines in the officers' private vehicles falls squarely within the exclusion to compensation provided by the express terms of "riding or traveling" in section 254(a). According to the defendant, the handlers do nothing more in their commute than "assume responsibility for the dogs seated in the back seats of their cars." (Defendant's Post–Trial Memorandum of Law, at p. 2). Moreover, the defendant contends that the cases relied on by the plaintiff in support of compensating travel time are inapposite, because the cases deal with travel from a central work location to a job site, and not from the home to the job site.

3. *Transportation of the Canines is Compensable Work Under the FLSA.*

■ To date, apparently only one court has analyzed and squarely addressed the issues raised here, and that court decided that transporting the canines to work is a compensable activity under the FLSA. *See Graham v. City of Chicago,* 828 F.Supp. 576 (N.D.Ill.1993). Moreover, while not analyz-

ing the issue of transporting the canines to and from work, two other courts have similarly determined that the off-duty home care a dog handler renders to the canine is integral and indispensable to the primary activity of being a dog handler, and, thus, outside the ambit of section 254(a)'s exclusion from compensation. *See Truslow v. Spotsylvania County Sheriff*, 783 F.Supp. 274 (E.D.Va. 1992), *aff'd* 993 F.2d 1539 (4th Cir.1993) and *Nichols v. City of Chicago*, 789 F.Supp. 1438 (N.D.Ill.1992).

In *Graham* the plaintiffs—City of Chicago police dog-handlers—sought to be compensated under the FLSA for transporting the canines to and from work. After reviewing the statutory and regulatory background of the Portal-to-Portal Act, and the criteria enunciated in *Steiner* and *Dunlop* to determine whether an activity is integral and indispensable to a primary activity, the *Graham* court rejected the defendants' argument that transportation of the canines fell within the exclusion of section 254(a). Rather, the *Graham* court concluded that transporting the canines was a primary activity that was compensable under the FLSA:

> "[T]ime spent transporting police canines is more than merely 'riding to work'.... Rather, it is an integral and indispensable part of the officers' principal duties as canine police officers and thus not excluded from coverage. Certainly, the officers need to get themselves to work every day. *However, when transporting the canines, they are performing an indispensable part of their principal activities that is required by their employer and which inures to the employer's benefit.*
>
> As in *Dunlop*, these activities are 'within the range of principal activities covered by the act and [are] performed at the behest and for the benefit of the employer.' Certainly, if the City provided a central kennel for the dogs, the time spent picking up the dogs at the kennel and transporting them to work would be compensable even though it would be 'riding' to work. *The City may not escape liability by requiring the officers to board the dogs at home.*"

*Graham*, 828 F.Supp. at 582 (emphasis added, quoting *Dunlop, supra.*).

Significantly, the *Graham* court determined that transporting the canines was neither a preliminary nor a postliminary activity, because transportation of the dogs occurred after the officers began their principal activity in the morning of feeding and preparing the dogs for the day's work, and before the end of the principal activity at night upon returning home. *Id.* at 582.

Although not dealing with the issue of whether transporting the canines is a compensable activity under the FLSA, the court in *Nichols v. City of Chicago, supra,* succinctly reviewed the issue of compensating dog handlers for the off-duty care of the canines. There, the court found that the off-duty dog care activities of the plaintiff officers were integral and indispensable to the principal activity, because such activities were necessary, required, of benefit to the employers, and identical to the activities and care given the canines while on duty.

> "First, plaintiffs' off duty home dog-care activities are necessary to the plaintiffs' principal activities of canine patrol. It is not disputed that in order for the canine patrol officer to properly perform his or her principal activity of canine patrol, the canine portion of the work team must be in proper working order.... Second, the plaintiffs perform their off-duty dog-care activities at the behest and for the benefit of the City.... Moreover, the plaintiffs efforts at keeping the police dogs well-fed and free of disability are clearly for the benefit of the City, which owns the police dogs. Last, and perhaps most significant, the City compensates the plaintiffs for dog-care activities performed by the plaintiffs while on duty. *The dog care activities are identical no matter when or where performed.*" *Nichols*, 789 F.Supp. at p. 1442 (emphasis added). *Accord Truslow*, 783 F.Supp. at p. 279.

This Court agrees with the reasoning of the *Graham* court, and finds that transporting the canines is also compensable under the FLSA, because that activity is not *segregable* from the primary activity the officers are engaged in. *See* 29 C.F.R. § 790.7(d). All of the criteria established under *Steiner* and *Dunlop* defining "integral and indispensable"

have been met in this case, and the facts support a determination that transporting the dogs is an integral and indispensable activity to the officers' primary activity, and a direct, substantial benefit to the handlers' employer.

First, transporting the dogs to work in the officers private vehicles is *required* by the defendant employer. Indeed, the dog handlers are *prohibited* from using mass transit to transport the dog, or to car pool. Second, transporting the dogs is *necessary* to the primary activity engaged in by the dog-handlers. Transporting the dogs facilitates the close bond between the officer and dog that is necessary for the successful working relationship between the two. Moreover, while transporting the dog the officer is engaged in reinforcing this "bonding" process, and is attentive to the needs of the dog. Beyond keeping the vehicle clean, the officer must maintain proper eye contact with the canine during stops, and control of the dog's agitation level. (Tr. 217, 239 and 282).

Third, transporting the dogs *directly benefits the defendant employer.* Requiring that the dogs be transported directly to and from the BAT in the officers' private vehicles, with all of the attendant circumstances involving bonding with the dog, facilitates the working relationship of the dog and handler, avoids centralized kenneling in the City at the TA's expense, and inures to the direct benefit of the TA. Finally, the off-duty transportation of the dogs is not fundamentally different from their on-duty transportation. The tasks performed by the officers while transporting the dogs on-duty are closely related, if not identical, to the tasks performed in transporting the dogs while off-duty. The similarity of on and off-duty dog care by dog handlers led the *Nichols* and *Truslow* courts to conclude that off-duty care of the dogs at home was compensable under the FLSA. The same reasoning applies to transportation of the dogs, and, therefore, the off-duty transportation activity should be compensated similar to the compensable on-duty transportation.

The defendant's argument that the Court in *Truslow* determined that transportation of the canines was not compensable under the

FLSA, is without merit. In *dicta, Truslow* only referred to the issue in a footnote, *see Truslow,* 783 F.Supp. at 277 n. 5, 279, and did not undertake any analysis of the issue under the statute and regulations as this Court and the court in *Graham* has done. The Court, therefore, finds that *Truslow* is not dispositive of the issue presently before this Court. *Accord Graham,* 828 F.Supp. at 579.

Finally, the Court notes that the conclusion it has reached is supported by the policies and purposes underlying the Portal-to-Portal Act. The primary evil that section 254(a) was directed at alleviating was compensating workers for the time they spent traveling before and after the work whistle, such as riding to and from work or walking to their work bench after entering the factory gate. Congress recognized that compensating such time under the FLSA potentially subjected employers and the economy to billions of dollars in compensation claims, and threatened the then war effort. *See* 29 U.S.C. § 251(a) (Congressional findings of Portal-to-Portal Act); S.Rep. No. 48, *supra,* §§ 2–3, pages 5–41). Thus, for example, the Act sought to prevent, unless otherwise required by a written contract or custom in effect at the workplace, compensation to underground miners for the time spent traveling between the portal of the mine and the working face at the beginning and end of each workday, or compensation to factory workers for walking and riding between the plant gate and the actual place of performance of their work. *See* 29 C.F.R. §§ 790.-5(b) and 790.7(e); S.Rep. No. 48, at 47.

However, as described above, the Act's language does not portend to cover every possible situation. The congressional sponsors of the Act realized that activities may be preliminary or postliminary in one situation, and principal activities in another. *See* 29 C.F.R. § 790.7(h) n. 50 (citing S.Rep. No. 48). For that reason, walking, riding or transporting that is integral to the job is not considered a preliminary or postliminary activity. *See* 29 C.F.R. § 790.7(d) n. 47.

In light of these policies, the instant case is not a quintessential portal-to-portal case involving compensation for time spent travel-

ing from the factory gate to the job site. The "work whistle" for the dog handlers starts earlier in the day, when the dog handlers prepare the dogs for their days work, and ends later at night, after feeding and exercising the dogs. Rather then merely riding to work, transporting the dogs is part and parcel of—that is, not segregable from—the work activity for the dog handlers, and is integral and indispensable to their daily principal activity. Such transportation is far removed from the type of riding or transporting Congress had in mind when it enacted section 254(a).

## CONCLUSIONS

The Court finds that the plaintiff Secretary has sustained his burden of proving that the daily transportation of the canines to and from the Brooklyn Army Terminal and their homes by the dog handlers is a principal activity within the meaning of 29 U.S.C. § 254(a), because it is integral and indispensable to the principal activity of the dog handlers. Such transportation is required of the dog handler by the defendant employer, is necessary to the proper functioning of the dog handlers' principal activity, is for the direct benefit of the defendant employer, and is compensable when performed on-duty.

Accordingly, judgment is granted in favor of the plaintiff to the following extent. The defendant New York City Transit Authority is prospectively permanently enjoined from violating the overtime and recordkeeping provisions of the Fair Labor Standards Act with respect to the transportation of canines by the TAPD dog handlers to and from their home and the BAT. Further, the TA is restrained from withholding the unpaid withheld overtime compensation.

In addition, the defendant TA is liable for unpaid overtime compensation owing to its employees with regard to the travel time of the TAPD dog handlers from October 15, 1990 to the present time.

As to the status of this case, and to determine whether any further proceedings are required, the parties are directed to appear at the United States Courthouse, 2 Uniondale Avenue, Uniondale, New York, Court-

room A, on December 22, 1993 at 9:00 o'clock a.m.

**SO ORDERED.**