*181 MICHAEL J. GABLEMAN, J.
¶ 142. (dissenting). I agree with the lead opinion's and the concurring/dissenting opinion's conclusion that Weissman v. Tyson Foods, Inc., 2013 WI App 109, 350 Wis. 2d 380, 838 N.W.2d 502, review granted, 2013 WI 3, 352 Wis. 2d 351, 842 N.W.2d 359, need not be overruled. However, I do not agree with the lead opinion's and the concurring/dissenting opinion's conclusion that Hormel must compensate its employees for the time they spend "donning and doffing" company-required "whites" at the Beloit cannery. Unlike a majority of this court, I conclude that the "donning and doffing" of the "whites" in this case is not "integral and indispensable" to the employees' principal work activity of canning food.
¶ 143. Because an "integral and indispensable" analysis is context-specific, I begin by laying out the facts of the present case.[1] I then take up the two issues before this court: (1) is the "donning and doffing" of company-required "whites" compensable work time or non-compensable preliminary and postlimi- *182 nary activities under Wis. Admin. Code. § DWD 272.12(2)(e); and (2) if the time spent "donning and doffing" is otherwise compensable work time, is this time non-compensable under the doctrine of de mini-mis non curat lex?
I. FACTUAL BACKGROUND
f 144. Hormel Foods Corporation ("Hormel") is a multi-national company specializing in food production. All the parties and the lead opinion agree that "Hormel is a fine employer with a quality record and a history of producing good, safe food for customers around the world." Lead op., ¶ 12.
f 145. Hormel has a variety of food producing plants located in different states. At every one of these plants, and without regard to what is being produced, Hormel requires its employees to "don and doff" either "whites" or "blues." Most employees wear "whites," but the maintenance department wears "blues." Every day Hormel employees "don and doff' hardhats, hearing protection, eye protection, hair nets, shoes,[2] and clean clothes. I use the term "whites" to refer to all of the above described items. Depending on the nature of the job, some employees "don and doff" additional clothing and gear on top of their "whites." Currently, Hormel's employees are not paid for the time it takes to "don and doff' the "whites."[3] "Donning and doffing" the "whites" takes, at the median, 2.903 minutes per day. More *183 specifically, "donning" the "whites" takes, at the median, 2 minutes, 3.84 seconds (or 2.064 minutes),[4] and "doffing" the "whites" takes, at the median, 50.34 seconds (or .839 minutes).[5] "Donning and doffing" the "whites," washing hands,[6] and walking to an assigned *184 work station takes,[7] at the median, 5.7 minutes per day.[8]
¶ 146. This case concerns only Hormel's Beloit cannery. The Beloit cannery employs approximately 290 people for various types of work ranging from quality control technician to forklift driver to sanitation crew member. The record reflects that only half of Hormel's employees at the Beloit cannery work near open product. Additionally, only half of the Beloit cannery has open product in it.
¶ 147. As a cannery, the Beloit facility is mainly tasked with preparing, canning, and shipping "shelf-stable" canned goods, including items such as Hormel Chili, Mary Kitchen Hash, and Chi-Chi's Salsa. This process is largely assembly like: outside suppliers deliver raw product in a receiving area; the product is cooked; the cooked product is placed into a can or glass container; and the canned product is sent through a final heating process. It is this final heating process, called "12-D cook" for canned products or "acidification" for glass products, that renders the product shelf-stable.
¶ 148. The 12-D cook and acidification processes are quite technical. For example, Resha Hovde, *185 Hormel's corporate manager of regulatory compliance and HACCP, testified that Hormel's 12-D cook process
provides a thermal destruction of organisms, of a trillion organisms. It's 12 to the 10th power. So if you could imagine a trillion organisms, and whatever product it is, it would destroy all the vegetative organisms .... So through time, an extensive amount of time at a high temperature, we're able to eliminate those organisms of concern.
In short, the 12-D cook and acidification processes "destroy any organisms of concern" such that any organism in the can or glass container "certainly wouldn't be a food safety issue."[9] No employees come into contact with open product after the 12-D cook or acidification processes. The next time the product would come into contact with someone would be when a consumer opens the can.
*186 ¶ 149. As noted by the lead opinion, Hormel is subject to federal regulation by the United States Department of Agriculture (USDA), the United States Food and Drug Administration (FDA), and the federal Occupational Safety and Health Administration (OSHA). These regulations ensure that Hormel satisfies cleanliness, quality, and safety standards; however, these regulations "do not require these standards be satisfied in any particular manner." Lead op., ¶ 17. Instead, the regulations "generally speak to the point that [Hormel] need[s] [its] employees to be clean in a manner to prevent product adulteration or the general creation of unsanitary type conditions." Notably, the circuit court found,
The USDA and FDA regulations do not require employees at the Beloit facility to wear whites. The USDA and FDA regulations do not specify who has to own or launder the clothing worn by the employees at the Beloit facility. Those regulations do not specify where the items have to be donned, doffed, and stored.
Hormel employees could wear street clothes at the Beloit facility and still comply with USDA and FDA regulations. USDA and FDA regulations do not require employees at the Beloit facility to keep their shoes within the facility. The use of captive or dedicated shoes is not the only method to avoid contamination at the Beloit plant. Hair covering is left to the company's discretion under the USDA and FDA regulations but the hair needs to be secured in a manner to prevent potential for product adulteration.
Thus, one way Hormel promotes cleanliness, quality, and safety is by having its employees "don and doff" the "whites." But this "donning and doffing" is not mandated by any regulation.
*187 II. THE "DONNING AND DOFFING" OF THE "WHITES" IS NOT COMPENSABLE WORK TIME UNDER THE CODE OR PRECEDENT.
A. WISCONSIN ADMIN. CODE § DWD 272.12
¶ 150. To resolve this case, I must interpret and apply Wis. Admin. Code § DWD 272.12. Under Wis. Admin. Code § DWD 272.12(l)(a)l., employees "must be paid for all time spent in 'physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer's business.' " An employee's workweek "ordinarily includes 'all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace.' " Wis. Admin. Code § DWD 272.12(l)(a)l.
¶ 151. Compensable time is measured in terms of a "workday." According to Wis. Admin. Code § DWD 272.12(l)(a)2., the " '[w]orkday,' in general, means the period between 'the time on any particular workday at which such employee commences their principal activity or activities' and 'the time on any particular workday at which they cease such principal activity or activities.' " Activities that fall outside the workday are called "preliminary" or "postliminary" activities. See Wis. Admin. Code § DWD 272.12(2)(e)l.c. Pursuant to Wis. Admin. Code § DWD 272.12(2)(e), the "term 'principal activities' includes all activities which are an integral part of a principal activity." Moreover,
[a]mong the activities included as an integral part of the principal activity are those closely related activities which are indispensable to its performance. If an employee in a chemical plant, for example, cannot perform their principal activities without putting on *188 certain clothes, changing clothes on the employer's premises at the beginning and end of the workday would be an integral part of the employee's principal activity. . . .
Wis. Admin. Code § DWD 272.12(2)(e)l.c. (emphasis added).
¶ 152. To summarize, if the "donning and doffing" is a preliminary or postliminary activity, then it falls outside the workday and does not qualify as compensable work time. In contrast, if the "donning and doffing" is a principal activity, then it falls within the workday and qualifies as compensable work time. Principal activities include those activities that are an "integral and indispensable" part of a principal activity.
B. PRECEDENT: WEISSMAN v. TYSON FOODS, INTEGRITY STAFFING SOLUTIONS, INC. v. BUSK, STEINER v. MITCHELL, AND MITCHELL v. KING PACKING CO.
¶ 153. In addition to interpreting and applying the pertinent portions of Wis. Admin. Code § DWD 272.12,1 also look to applicable case law as a guide for determining when an activity is "integral and indispensable." Four cases, one from the court of appeals and three from the Supreme Court of the United States are particularly relevant; thus, a brief recitation of the facts and holdings of each case is appropriate.
f 154. In Weissman v. Tyson Foods, Inc., 2013 WI App 109, 350 Wis. 2d 380, 838 N.W.2d 502, review granted, 2014 WI 3, 352 Wis. 2d 351, 842 N.W.2d 359,[10] *189 the court of appeals considered whether the "donning and doffing" of sanitary and protective gear was com-pensable work time. 350 Wis. 2d 380, ¶ 1. There, the Tyson employees at the Jefferson plant primarily produced pepperonis, a ready-to-eat meat product. Id,., f 4. To answer the question of whether the employees "donning and doffing" qualified as compensable work-time, the court conducted a two-step analysis.
f 155. First, it began with the statutory language of Wis. Admin. Code § DWD 272.12(l)(a)l., which contains two requirements: the activity (1) must be "controlled or required by the employer" and (2) must be done "necessarily and primarily for the benefit of the employer's business." Id., ¶¶ 17-21. Second, the court went on to discuss whether the activity was an "integral part" of a "principal activity." Id., ¶¶ 22-26. It concluded that an "integral part" meant an activity that is (1) closely related to the principal activity and (2) indispensable to its performance. Id., ¶¶ 26, 28-31. Using this two-step approach, the court concluded that the "donning and doffing" was compensable under the circumstances. Id., f 37; but see Mitchell v. JCG Industries, Inc., 745 F.3d 837 (2014) (holding that the minimal time employees spent "donning and doffing" sanitary gear during bona fide meal breaks and at the beginning and end of each day was not work time that had to be compensated).
¶ 156. A few months after the Wisconsin Court of Appeals decided Tyson Foods, the Supreme Court of the United States decided Integrity Staffing Solutions, Inc. v. Busk, _ U.S. _, 135 S. Ct. 513 (2014).[11] In *190 Integrity Staffing, the Court addressed the issue of "whether the employees' time spent waiting to undergo and undergoing [a] security screening!] [was] compensable under the [Fair Labor Standards Act]." 135 S. Ct. at 515. The Court concluded that the "roughly 25 minutes" employees spent each day was not compensable work time. Id.
¶ 157. In reaching that conclusion, the Court reiterated that it "has consistently interpreted 'the term "principal activity or activities" [to] embrac[e] all activities which are an integral and indispensable part of the principal activities.' " Id. at 517 (emphasis added) (quoting IBP, Inc. v. Alvarez, 546 U.S. 21, 29-30 (2005)). Moreover, the Court clarified that "an activity is . . . integral and indispensable to the principal activities that an employee is employed to perform if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." Id. (emphasis added). Finally, the court unequivocally rejected other courts' reliance on a required-benefit analysis: "The [Ninth Circuit] erred by focusing on whether the employer required a particular activity. The integral and indispensable test is tied to the productive work that the employee is employed to perform." Id. at 519 (emphasis omitted). Additionally, the Court noted, "A test that turns on whether the activity is for the benefit of the employer is similarly overbroad."[12] Id. The Court rejected the *191 required-benefit approach because " [i]f the test could be satisfied merely by the fact that an employer required an activity, it would sweep into 'principal activities' " the type of preliminary and postliminary activities that Congress worried would "bring about the financial ruin of many employers," would result in "windfall payments" to employees, and attempted to remedy when it enacted the Portal-to-Portal Act.[13] Id. at 517, 519 (internal quotation marks omitted) (quoting 29 U.S.C. §§ 251(a)-(b)).
¶ 158. The "integral and indispensable" test is no cake walk for the party who seeks to establish its requisite elements; it imposes a tough standard. For example, in Steiner v. Mitchell, 350 U.S. 247 (1956), the Court addressed
whether workers in a battery plant must be paid as part of their "principal" activities for the time incident to changing clothes at the beginning of the shift and showering at the end, where they must make extensive use of dangerously caustic and toxic materials, and are *192 compelled by circumstances, including vital consideration of health and hygiene, to change clothes and to shower in facilities in which the state law required their employer to provide, or whether these activities are "preliminary" or "postliminary" ....
350 U.S. at 248 (emphasis added). In answering that question, the Court looked to the particular circumstances of the battery plant, which included the fact that employees "customarily work with or near the various chemicals in the plant [, including] lead metal, lead oxide, lead sulphate, lead peroxide, and sulphuric acid." Id. at 249. There, the "very great" risks associated with the plant's conditions mandated "the removal of clothing and showering at the end of the work period." Id. at 250. In fact, the practice of clothing removal and showering " [had] become [such] a recognized part of industrial hygiene programs in the industry [that] the state law of Tennessee [required] facilities for th[at] purpose." Id.
¶ 159. Under those circumstances, the trial court found, and the Court agreed, that the employees' activities (changing clothes and showering) "[were] made necessary by the nature of the work performed; . . . and that they [were] so closely related to other duties performed by (petitioners') employees as to be an integral part thereof, and [were], therefore, included among the principal activities of said employees." Id. at 252 (emphasis added) (internal quotation marks omitted). In short, changing clothes and showering was an "integral and indispensable" part of the production of batteries because without it, employees would be exposed to chemicals and potentially poisoned. Id. at 249. To emphasize just how integral the changing and showering was under those particular circumstances, the Court concluded by saying, "[I]t *193 would be difficult to conjure up an instance where changing clothes and showering are more clearly an integral and indispensable part of the principal activity of the employment than in the case of these employees." Id. at 256.
¶ 160. Mitchell v. King Packing Co., 350 U.S. 260 (1956), serves as another example of just how tough the "integral and indispensable" test is. In Mitchell, the Court considered "whether the knife-sharpening activities of the employees of respondent King Packing Co." were an "integral and indispensable" part of the principal activity of meatpacking. 350 U.S. at 261. Meatpacking includes the "slaughtering, butchering, dressing, and distributing" of meat. Id.
¶ 161. There, the Court noted that "[v]arious knives and electric saws [were] used on the butchering operation" and that "all of the knives as well as the saws must he 'razor sharp' for the proper performance of the work." Id. at 262 (emphasis added). The knives needed to be "razor sharp" because "a dull knife would slow down production which is conducted on an assembly line basis, affect the appearance of the meat as well as the quality of the hides, cause waste and make for accidents." Id. The Court added, "[for] a knife to be of any practical value in a knife job[, it] has to be.. . sharp." Id. (emphasis added). Consequently, the Court held that the knife-sharpening activities were "an integral part of and indispensable to the various butchering activities for which [the employees] were principally employed." It did so because the knives needed to be "razor sharp" to perform the principal activity of slaughtering, butchering, dressing, and distributing the meat. Id. at 261, 262.
*194 C. THE OUTCOME OF THE LEAD OPINION AND THE CONCURRING/DISSENTING OPINION CANNOT SURVIVE APPLICATION OF THE "INTEGRAL AND INDISPENSABLE" TEST.
¶ 162. Turning to the employees at the Beloit cannery, I conclude that the "donning and doffing" of the "whites" is not "integral and indispensable" to performance of a principal activity; therefore, it is not compensable. In this case, the "donning and doffing" of the "whites" by Hormel's employees is not an "intrinsic element" of canning food; moreover, an employee could easily dispense with the "donning and doffing" of the "whites" and still complete his or her principal activity of safely canning clean food.
¶ 163. As a result, the lead opinion's and the concurring/dissenting opinion's conclusion that the "donning and doffing" of the "whites" is "integral and indispensable" to a principal activity is incorrect. It is incorrect for two main reasons: (1) the lead opinion says that the applicable federal food, health, and safety regulations require Hormel to have its employees "don and doff' the "whites", but the regulations do not contain such a requirement; and (2) the lead opinion relies on and affirms the circuit court's analysis, but the circuit court applied the wrong test.[14]1 will *195 discuss these two reasons in detail, and then I will provide two examples of when "donning and doffing" would be compensable.
1. The FDA and USDA Regulations Do Not Support The Lead Opinion's Conclusion.
¶ 164. To begin, the "donning and doffing" of the "whites" is not required by the applicable federal food, health, and safety regulations. There was abundant testimony regarding this point at trial:
Q. Are the whites necessary to avoid contamination at the Beloit facility ?
A. No, they're not.
Q. Can you explain to me why that is?
A. Again, back to the regulation, there's various means to an end. And in that type of environment, in the food safety realm, we kind of categorize our plants into, you know, maybe high-risk operations. In our meat and poultry establishments that produce ready, or what we determine to be ready-to-eat exposed meat products, those are determined to be high-risk operations. Canning operations such as the Beloit facility are deemed lower risk due to that 12 — D type cook process, the canning process in general.
Q. Could Hormel allow employees to wear street clothes at the Beloit facility and still comply with the FDA regulations?
A. Yes, they could.
*196 Q. And could Hormel allow employees to bring whites home with them and bring them back to the facility and still comply with the FDA regulations?
A. Yes, they could. The clothes just need to be clean.
Q. So long as the clothing is clean?
A. That's correct.
Q. Do the FDA regulations require employees at the Beloit facility to keep their shoes within the facility?
A. No, they do not.
Q. What, if anything, do the regulations require in terms of the shoes people wear at the Beloit facility?
A. Again, it's just clean and what we need to prevent adulteration of the product.
Q. Are captive, or as you've termed it, dedicated shoe, is that necessary to avoid contamination at the Beloit facility?
A. No, it's not.
Q. Do the FDA regulations require employees at the Beloit facility to wear the hardhats that you see on Holly Hormel?
A. No, the FDA regulations do not.
Q. What, if anything, do the FDA regulations require in terms of hardhats?
A. In terms of hardhats, nothing. As far as hair covering, they leave it to our discretion. The hair should be secured, a manner secured to prevent the potential for product adulteration.
*197 Q. Okay. Do the FDA regulations require employees at the Beloit facility to wear safety glasses?
A. No.
Q. Do the FDA regulations require employees at the Beloit facility to wash their hands?
A. Again, the regulations are not very specific. It's somewhat of a means to an end, and it does describe where necessary they should be washing their hands. So if they're in direct product contact, they should be washing their hands per the FDA regulations.
(Emphasis added.) Similarly, the USDA regulations do not require "donning and doffing":
Q. Do the USDA regulations require employees at the Beloit facility to wear whites?
A. No, they do not.
Q. What, if anything, do the USDA regulations require in terms of clothing at the Beloit facility?
A. Again, it's very open-ended in terms of, you know, there's various means to an end. We just have to prevent adulteration and the creation of insanitary conditions. So essentially clean clothes.
Q. Do the USDA regulations specify who has to own or launder the clothing worn at the Beloit facility?
A. They do not.
Q. Do the regulations specify where those items are donned and doffed and stored?
A. No.
*198 Q. Does wearing the whites at the Beloit facility comply with the USDA regulations?
A. Yes, it does.
Q. Are whites necessary to prevent the adulteration of product or the creation of insanitary conditions at the Beloit facility ?
A. No, they 're not.
(Emphasis added.) After hearing all the testimony regarding the federal regulations, the circuit court even concluded that the federal regulations do not require employees to wear the "whites," do not specify where the "whites" have to be "donned," "doffed," or stored, and do not require captive shoes. Indeed, the circuit court concluded that "Hormel employees could wear street clothes at the Beloit facility and still comply with the USDA and FDA regulations." (Emphasis added.) In sum, compliance with the federal regulations under these circumstances is not — and cannot be — what makes the "donning and doffing" of the "whites" "integral and indispensable" to the employees' principal activity of canning food. The lead opinion nonetheless contorts these federal regulations into just such a conclusion.
2. The Lead Opinion Conflates The Required-Benefit Test With The "Integral and Indispensable" Test.
¶ 165. The lead opinion's reliance on the circuit court's "comprehensive decision holding in favor of the Union" is mistaken because the circuit court incorrectly applied the "integral and indispensable" test by repeatedly focusing on whether the "donning and doffing" was required by and benefitted Hormel. Lead op., *199 ¶ 5. In other words, the lead opinion conflates the required-benefit test with the "integral and indispensable" test.
¶ 166. After discussing whether the "donning and doffing" of the "whites" was required by and benefitted the employer, the circuit court appeared to transition to analyzing and applying the "integral and indispensable" test. In fact, the heading of this section in the circuit court's opinion and order reads, "ARE THE ACTIVITIES CLOSELY RELATED TO AND INDISPENSABLE TO PERFORMANCE OF A PRINCIPAL ACTIVITY?" Moreover, the circuit court acknowledged that "[e]ach of the class members agreed that there was nothing essential about the clothes Hormel required them to wear in order to get their job done. Each of them agreed that they could probably perform each of the movements required by their job even if wearing street clothes." The circuit court went on to quote plant manager Scott Ramio:
A. The clothes that they put on are there for their benefit and they're a good manufacturing practice and we require it, that's not disputed. But it, it doesn't have anything to do with the production of the product, I guess, for lack of— maybe I'm oversimplifying it, but its not required, it — I'm sorry, it's not essential as they make the product, it adds nothing to it. Now there are certain food manufacturing processes that, you know, perfectly clean clothes and, and like a ready-to-eat atmosphere, say something like that, we don't have any of those in the Beloit plant that it might add some value to it. But I can go there today and produce the products and do everything that everybody had on that screen other than the sanitation job, I can make that product the same quality. It's no different. And the key to the whole process in the Beloit plant being a cannery is that the product is pressure cooked and it's *200 shelf-stable. So any microorganisms, that type of thing that might be inferred by having perfectly clean clothing each day really is negated by the thermal process. .. .
(Emphasis added.) Rather than applying the "integral and indispensable" test, however, the circuit court's analysis transformed into an analysis of the required-benefit test: " [t]he most important part of [Scott Ram-lo's] answer was at the start when he admitted that wearing the whites and gear was required by Hormel." (Emphasis added.)
¶ 167. The circuit court's emphasis ("the most important part") on the fact that "donning and doffing" the "whites" was required by the employer shows that the circuit court mixed a required-benefit analysis into what was supposed to be an "integral and indispensable" analysis. In fact, the circuit court's analysis is littered with references to the fact that "donning and doffing" was required by and benefitted Hormel:
Ms. Collins agreed that she could physically perform the tasks she is required to perform at work in clothes she wore from home but Ms. Collins continually, and correctly, pointed out that she is required to wear those clothes and equipment in order to get into the canning part of the plant pursuant to Hormel's rules.
The overwhelming evidence is that Hormel requires the class member to don and doff those materials to operate the Beloit facility in compliance with the federal regulations of USDA, FDA, and OSHA. There are also efficiencies already noted, an avoidance of recalls, and customer satisfaction benefits. All of these benefits are in place for Hormel because it requires the Class members to don and doff the clothing and equipment on the premises.
*201 I further find that the donning and doffing of the whites and related gear is indispensable to the performance of the class members' principal activities. This is so because Hormel has made it so. The only credible evidence is that Class members are required to wear these materials . . .
These acts are obligatory, essential, and absolutely necessary because Hormel controls the process and has required these acts.
The focus is not on what the United States government may require but, instead, what Hormel requires of its own employees.
These activities are controlled by the employer for the employer's benefit and are integral to the Class members' work.
(Emphasis added.) These are just a handful of times the circuit court looked at what Hormel required and whether Hormel benefited rather than looking to whether the "donning and doffing" of the "whites" was "integral and indispensable" to the principal activity of canning food.'[15] The circuit court did not have the benefit of the Supreme Court of the United State's decision in Integrity Staffing as the circuit court's decision was issued prior to Integrity Staffing. However, this court did have such guidance. The lead opinion's choice to rely on the circuit court's "comprehensive decision holding in favor of the Union" rather than the Supreme Court's instruction in Integrity Staffing is curious.
*202 D. ADDITIONALLY, THE TIME SPENT "DONNING AND DOFFING" THE "WHITES" DURING MEAL PERIODS IS NOT COMPENSABLE WORK TIME.
¶ 168. Related to the question of whether "donning and doffing" of the "whites" at the beginning and end of each work day is compensable, is the question of whether "donning and doffing" during the employees' 30-minute meal period is compensable. I have already concluded that the "donning and doffing" of the "whites" is not compensable because it fails the "integral and indispensable" test. However, I briefly comment on the lead opinion's and the concurring/dissenting opinion's analyses of this issue because I believe that neither can square their determinations that the "donning and doffing" of the "whites" at the beginning and end of the workday is compensable with their determinations that the exact same " donning and doffing" is not compensable when done over the lunch hour.
¶ 169. Most Hormel employees have a 30-min-ute unpaid lunch break. An employee may choose to go off his or her work premises to eat a meal. If an employee leaves, he or she is required to change out of his or her "whites" and then change back into the "whites" when he or she returns. Regardless of whether the employee leaves (and accordingly "dons and doffs") or stays on site, the employee is entitled only to 30 minutes.
¶ 170. Hormel's employees argue that they have been denied the "right under Wisconsin law to have a 30-minute lunch period free from duty in which the employee is free to leave the premises." The test for whether meal time "donning and doffing" is compensable is simple and familiar: meal time "donning and *203 doffing" is compensable if it is "integral and indispensable" to an employee's principal activity.[16]
¶ 171. The lead opinion and the concurring/dissenting opinion believe that the "donning and *204 doffing" of the "whites" is "integral and indispensable" to canning food and, therefore, compensable. Except, that is, when the "donning and doffing" occurs during the lunch hour instead of at the beginning and end of the work day. But the employees' principal activity has not changed; it is still canning food. And what is required to be "donned and doffed" has not changed; it is still the "whites." The only change is the time at which the employee "dons and doffs."
¶ 172. To say that "donning and doffing" of the "whites" is "integral and indispensable" when an employee arrives and leaves at the end of the day but is not "integral and indispensable" when an employee leaves and arrives at lunch is unsupported by the law. If the lead opinion and the concurring/dissenting opinion conclude (as they do) that the "donning and doffing" of the "whites" is so "integral and indispensable" to canning food at the start of the shift at the beginning of the day that it must be compensable, then they must also conclude that the "donning and doffing" of the "whites" is "integral and indispensable" to canning food at the start of the shift after the lunch period. The lead opinion and the concurring/dissenting opinion somehow do not. In doing so, the lead opinion and the concurring/dissenting opinion admit that the "donning and doffing" of the "whites" is not truly "integral and indispensable" to the employees' principal activity of canning food.
E. "DONNING AND DOFFING" IS SOMETIMES COMPENSABLE.
¶ 173. That the "donning and doffing" of the "whites" is not compensable under our specific factual circumstances becomes abundantly clear when corn- *205 pared to "donning and doffing" that is compensable under other circumstances.
¶ 174. For instance, some of Hormel's employees are part of a sanitation crew; these sanitation crew members "play a real critical part in cleaning the entire plant up top to bottom every night. . . ." Employees who work in sanitation wear different and additional clothing and equipment:
They will wear — the eyewear is more of a goggles and, in addition to a face shield. They also wear — the footwear would be different. They're standing in water the entire time. So tennis shoes, something like that, wouldn't be appropriate. And then they have — we call it a rain suit, but it's just a big yellow pants with suspenders and a coat that's yellow, too. So it protects them. And then they also, I think all of them wear arm guards. So you're sealed against the chemicals that you work with. Pretty much every job in our wet area, you're dealing with chemicals every night.
Hormel pays its sanitation workers to "don and doff" this additional clothing and equipment because " [the sanitation workers] really couldn't do their job without [it]. I mean safety and commonsense, everything says that they wouldn't be able to safely work out there with all those chemicals without this equipment." (Emphasis added.) Simply put, the sanitation crew's principal activity is sanitizing the plant, and sanitizing the plant necessitates contact with "very caustic or acidic" chemicals; therefore, the sanitation crew must wear protective gear in order to sanitize the plant with chemicals.[17]
¶ 175. Here is a second example. In addition to running a cannery, Hormel runs other types of food- *206 related operations. In Algona, Iowa, Hormel runs a dry sausage operation, which primarily makes pepperonis.[18] At trial, Francisco Velaquez, a resource and safety manager at Hormel, testified that pepperoni is a ready-to-eat meat product that must be produced in a ready-to-eat facility. For comparison, plants that produce ready-to-eat meat products are considered "high-risk operations" whereas canneries are considered "lower risk" because food product at a cannery goes through the 12-D cook or acidification processes. Because pepperonis are a high-risk, ready-to-eat meat product, employees at this type of facility must "don and doff" additional items on top of their "whites" to prevent different types of contamination (contamination that is not annihilated with a 12-D cook or acidification process).[19]
*207 ¶ 176. For instance, a high-risk, ready-to-eat meat facility is especially concerned with Listeria' or Salmonella, which is often tracked into a plant by street shoes. To combat those risks," [Hormel] ha[s] [its employees] change into these rubber boots. Then [the employees] have to go through something called a boot scrubber, and there [Hormel] appl[ies] quaternary ammonium" to reduce contamination. Additionally, employees "typically have plastic aprons that they put over their whites. . . . And then they have these things called sleeve guards that are plastic that go up to their elbows, and then they have rubber gloves that they wear that they tuck under their sleeve guards."
¶ 177. Employees at these high-risk, ready-to-eat meat facilities are paid for the time they spend "donning and doffing" their additional gear; that is, they are paid for the time it takes to put on, wash, and take off their boots as well as the time it takes to put on and take off their aprons, sleeve guards, and rubber gloves. The "donning and doffing" of this extra gear is compensable because it is "integral and indispensable" to producing high-risk, ready-to-eat meat products.
¶ 178. The above two examples help to illustrate exactly what the "integral and indispensable" test calls for. Namely, for the employer-required activity to be compensable, it must be an "intrinsic element" of the activity performed and "one with which the employee cannot dispense if he is to perform those activities." Integrity Staffing, 135 S. Ct. at 517. A sanitation crew member cannot dispense with his or her extra clothing and equipment due to the "very caustic or acidic" chemicals he or she is exposed to while performing his or her principal activities of cleaning and sanitizing. A ready-to-eat meat facility employee cannot dispense with his or her extra clothing and equipment due to the *208 high-risk nature of certain types of contamination at a ready-to-eat meat facility. But a cannery employee at a "lower risk" facility can dispense with wearing "whites" and still safely produce clean food.
¶ 179. In sum, Hormel's own employees put it best when they testified, and the circuit court found that "there is nothing essential about the clothes Hormel required them to wear in order to get their job done." (Emphasis added.) I agree with Hormel's employees. The "donning and doffing" of the "whites" is not "integral and indispensable" to the Beloit employees' principal activity of canning food; therefore, the time spent "donning and doffing" the "whites" is not compensable.
III. WHAT THE LEAD OPINION DOES NOT DECIDE: THE DE MINIMIS NON CURAT LEX DOCTRINE.
¶ 180. I now turn to the second issue: whether the requirement for compensation for time spent "donning and doffing" would be obviated by the doctrine of de minimis non curat lex ("the law doesn't care about trifles"). Because I have concluded that the employees "donning and doffing" of the "whites" is not compensable, I need not consider whether the time spent "donning and doffing" is de minimis.
¶ 181. However, I write to point out that the lead opinion, while pretending to engage in a de minimis-like discussion, does not actually answer the question before us. Specifically, the lead opinion does not determine whether the de minimis doctrine applies in Wisconsin, does not explain what test or approach it used to reach its conclusion, and thus, does not provide any guidance for courts and parties moving forward. *209 We grant review of cases only when "special and important reasons are presented" and when a decision will help "develop, clarify or harmonize the law." Wis. Stat. § 809.62(lr),(lr)(c). In choosing not to answer the question before this court, the lead opinion fails to help "develop, clarify or harmonize the law." As a result, while this case is decided by the lead opinion for these employees at this facility, the issue of whether the de minimis doctrine applies in Wisconsin and how a de minimis determination would be conducted lives on.[20]
¶ 182. The de minimis doctrine simply asks the following: should all "integral and indispensable" activities, including those that last a single second or a handful of seconds or minutes be recorded by and paid for by an employer? See Anderson v. Mt. Clements Pottery Co., 328 U.S. 680, 692 (1946) ("Split-second absurdities are not justified by the actualities of working conditions . . . ."). Or are there ever activities that take such a small, trivial amount of time that a court should not expect an employer to keep track of and compensate for this time? See JCG Industries, 745 F.3d at 842, 841 (noting that " [c]ommon sense has a place in *210 adjudication" and commenting that "[o]ne reason to withhold a remedy is that the harm is small but measuring it for purposes of calculating a remedy would be difficult, time-consuming, and uncertain, hence not worthwhile given that smallness"); Lindow v. United States, 738 F.2d 1057, 1062 (9th Cir. 1984) (" [C]ommon sense must be applied to the facts of each case."). The Supreme Court of the United States answered the de minimis question by holding that " [w]hen the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles maybe disregarded." Anderson, 328 U.S. at 692.
¶ 183. As a result, when a federal court determines that the time spent on an activity is compensable because it is "integral and indispensable," the court next determines whether that compensable time is rendered non-compensable by the de minimis doctrine. See id. at 693; Lindow, 738 F.2d at 1062 ("As a general rule, employees cannot recover for otherwise compensable time if it is de minimis."). In contrast, when a federal court determines that the time spent on the activity is not "integral and indispensable," the court's analysis ends and no compensation is due. See Integrity Staffing, 135 S. Ct. at 515 (concluding that the activity was not "integral and indispensable" and, therefore, not proceeding to a de minimis analysis). We have never before determined whether we should take this same approach in Wisconsin.[21] We were called upon to make that determination in this case.
*211 ¶ 184. Because the lead opinion concludes that the employees "donning and doffing" of the "whites" is compensable, it could have engaged in a full discussion of whether the de minimis doctrine applies in Wisconsin.[22] But it did not. To quote the lead opinion,
Assuming, without deciding, that the de minimis doctrine is applicable to claims under Wis. Admin. Code § 272.12, we conclude that in the instant case, the de minimis doctrine does not bar compensation for the time spent donning and doffing the required clothing and equipment because the time spent donning and doffing is not a "trifle."
Lead op., ¶ 98 (emphasis added).[23] Why assume without deciding? The question was certified by the court of *212 appeals, the parties spent roughly 17 pages of their respective briefs on the issue, and the parties addressed this issue during oral argument before this court. Perhaps the lead opinion chooses not to answer the question because it cannot reach its present outcome given what the law is.
¶ 185. The law is this. The Supreme Court of the United States first applied the de minimis doctrine in Anderson v. Mt. Clements Pottery Co., 328 U.S. 680 (1946). There, the employees alleged that their employers' method of calculating hours did not "accurately reflect all the time actually worked and that they were thereby deprived of" proper overtime compensation. Anderson, 328 U.S. at 684. The employees wanted their walk time to and from their workstations as well as their "donning and doffing" of work clothing included in their work hours. Id. at 682-83.
¶ 186. In resolving that question, the Court noted,
When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded. Split-second absurdities are not justified by the actualities of working conditions or by the policy of the Fair Labor Standards Act. It is only when the employee is required to give up a substantial measure of his time and effort that compensable working time is involved.
Id. at 692 (emphasis added). Later in the opinion, the Court reiterated, "it is appropriate to apply a de minimis doctrine so that insubstantial and insignificant periods of time spent in preliminary activities *213 need not be included in the statutory workweek. Id. at 693 (emphasis added). The Anderson Court's focus was on time, specifically whether the activity took just "a few seconds or minutes." See also Lindow, 738 F.2d at 1062 ("An important factor in determining whether a claim is de minimis is the amount of daily time spent on the additional work.").
¶ 187. While making sure to explain that it is not deciding whether the de minimis doctrine applies in Wisconsin, the lead opinion nevertheless discusses the doctrine and pays lip service to Anderson by quoting its use of the word "trifle." But unsurprisingly the lead opinion chooses not to apply Anderson's test.[24] Instead, *214 the lead opinion cherry-picks one factor (not found in Anderson) in which to ground its conclusion.[25] The lead opinion states,
[i]n the instant case, employees spend approximately 24 hours per year donning and doffing. Viewed in light of the employees' hourly rate of $22 per hour, the unpaid period in question may amount to over $500 per year for each employee and substantial sums for Hormel. We agree with the circuit court that in the instant case this time is not a "trifle."
Lead op., ¶ 102 (emphasis added).[26]
¶ 188. Hidden in the lead opinion's language is a conclusion that is at odds with the law: that 2.903 minutes is not de minimis. The lead opinion cannot *215 state outright that 2.903 minutes is not de minimis because it would be hard-pressed to reconcile that determination with the fact that Anderson designed the de minimis doctrine to preclude compensation when "the matter in issue concerne[d] only a few seconds or minutes of work." 328 U.S. at 692 (emphasis added). Moreover, it cannot state outright that 2.903 minutes is not de minimis because it would have to face the fact that "[m]ost courts have found daily periods of approximately 10 minutes de minimis even though otherwise compensable." Lindow, 738 F.2d at 1062 (emphasis added) (holding that the 7 to 8 minutes the employees spent on a pre-shift activity in that case was de minimis and citing a litany of cases for the proposition that daily periods of 10 minutes or less are de minimis).
¶ 189. If the lead opinion were to actually answer the question of whether the de minimis doctrine is a part of Wisconsin law, then it would have to focus on — or at the very least discuss — the amount of daily time spent on "donning and doffing" (here, 2.903 minutes) and whether that time qualifies as just a few "seconds or minutes." The lead opinion tiptoes past this quagmire by sidestepping the question entirely.[27] *216 concurring/dissenting opinion, this time becomes de minimis if it is not cabined because "if Hormel were required to record for payroll purposes the varying amounts of the time that each individual employee expends to don and doff at the beginning and end of each workday, it would appear to be almost an administrative impossibility to do so accurately." Id., ¶ 132; see also id., ¶¶ 109, 135, 138, 140.
The problem with the concurring/dissenting opinion's conclusion that it "would appear to be" an administrative impossibility to accurately record the time is that the circuit court made the exact opposite finding of fact in its opinion and order. The circuit court spent nearly two and a half pages in its order and opinion specifically addressing whether it would be administratively difficult for Hormel to accurately record "donning and doffing" time. Indeed, the section of the circuit court's opinion and order is titled "Practical Administrative Difficulties." There, the court stated,
Despite carrying the burden of proof on the de minimis issue, I find that Hormel has not provided credible evidence of administrative difficulties which may be encountered if it is required to record the additional donning and doffing time. As a result, factor two [of the Lindow test] also falls in favor of the Class.
(Emphasis added.) Later, the circuit court again emphasized that "the vague and unsubstantiated opinions of Hormel employees about the administrative difficulties of reimbursing the Class members for donning and doffing are belied by the daily activities at the Beloit Hormel plant. ... Hormel's processes show that it is able to monitor [employees] adequately." (Emphasis added.) Thus, the concurring/dissenting opinion's conclusion that it "would appear to be" an administrative impossibility to record the time spent "donning and doffing" is directly contrary to the circuit court's explicit finding of fact on that point. The concurring/dissenting opinion "appears" to ignore the circuit court's opposite finding of fact, as it fails to acknowledge the circuit court's factual finding and fails to provide any discussion of whether the circuit court's finding would be clearly erroneous.
*217 Consequently, the question is left unanswered and Wisconsinites are left wondering.
¶ 190. In sum, the lead opinion could have resolved the issue of whether the de minimis doctrine applies in Wisconsin, and it could have provided a workable test or approach for how to conduct a de minimis analysis. It chose not to. When we accept a case, we do so to help "develop, clarify, or harmonize the law." As such, the lead opinion owed the people of Wisconsin and the parties a full and thorough discussion on whether the de minimis doctrine applies in Wisconsin as well as a discussion on the proper method or approach for conducting a de minimis analysis. Because the lead opinion elects to leave today's question unanswered, it short-changes the people of Wisconsin.
IV. CONCLUSION
¶ 191. I cannot join the lead opinion because I believe it reaches the wrong conclusion as to whether the "donning and doffing" of the "whites" is "integral and indispensable" and reaches no determination as to whether the de minimis doctrine is a part of Wisconsin law or how a de minimis analysis is to be conducted in future cases.
¶ 192. For the reasons stated, I respectfully dissent.
¶ 193. I am authorized to state that Justice ANNETTE KINGSLAND ZIEGLER joins this dissent.
*218 [[Image here]]
*219 [[Image here]]
*220 [[Image here]]

 This dissent often quotes information contained in the record. The information quoted is largely derived from trial testimony and the circuit court's opinion and order. Below is a list of individuals who testified at trial:
Scott A. Ramio: Plant Manager at the Beloit cannery.
Pamela Collins: Quality Control, Weight, and Seam Technician at the Beloit cannery.
Charles Seeley: Production Specialist at the Beloit cannery.
Dennis Warne: Stork Operator at the Beloit cannery.
Resha Hovde: Corporate Manager of Regulatory Compliance and HAACP. HAACP stands for "hazard analysis critical control point."
Francisco Velaquez: Human Resource and Safety Manager at the Beloit cannery.

 Employees wear "captive" or "dedicated" shoes. Captive shoes are shoes that are left at the facility overnight.

 The concurring/dissenting opinion correctly notes that in the 1980's Hormel compensated its employees 12 minutes per day for "donning and doffing" under a then-existing collective bargaining agreement ("CBA"). Concurrence/Dissent, 1 113. *183 Eventually the compensation Hormel's employees received for "donning and doffing" was "bargained away." Id., ¶ 113 n.6.
The Wisconsin Administrative Code allows employees to bargain away rights they would otherwise have under the Code as long as the parties enter into a CBA agreement and apply for a waiver or otherwise meet the factors required for a waiver. See Wis. Admin. Code § DWD 247.05; Aguilar v. Husco Int'l, Inc., 2015 WI 36, ¶ 11, 361 Wis. 2d 597, 863 N.W.2d 556 (" [E]ven though the 20 — minute unpaid breaks were technically violations of the code, it would be unreasonable to grant back pay because the breaks had posed no health or safety concerns, the statute permits waivers in circumstances such as these, and the employees had enjoyed other benefits in exchange for ... the short unpaid meal periods.")
But, as the concurring/dissenting opinion points out, "Hormel does not argue that no compensation is due because such compensation was bargained away in a collective bargaining agreement, which is permitted under state and federal law." Concurrence/Dissent, ¶ 113 n.6.

 "Donning" a belt takes 16.740 seconds, "donning" ear plugs takes 6.960 seconds, "donning" a hair net takes 9.780 seconds, "donning" a hard hat takes 5.940 seconds, "donning" captive shoes takes 26.280 seconds, "donning" safety glasses takes 5.400 seconds, "donning" uniform pants takes 19.320 seconds, and "donning" a uniform shirt takes 18.780 seconds.

 "Doffing" a belt takes 3.720 seconds, "doffing" ear plugs takes 1.980 seconds, "doffing" a hair net takes 4.860 seconds, "doffing" a hard hat takes 4.440 seconds, "doffing" captive shoes takes 14.640 seconds, "doffing" safety glasses takes 3.480 seconds, "doffing" uniform pants takes 10.800 seconds, and "doffing" a uniform shirt takes 6.420 seconds.

 Washing hands takes 14.640 seconds.

 The time it takes to walk to and from an employee's workstation varies depending on the location of the workstation. The shortest walk time to a workstation takes 27.66 seconds, and the shortest walk time from a workstation takes 26.16 seconds (for a total of 53.82 seconds per day). The longest walk time to a workstation takes 2 minutes, 19.56 seconds, and the longest walk time from a workstation takes 1 minute, 31.74 seconds (for a total of 3 minutes, 51.3 seconds per day).

 Attached to this dissent are time tables contained in the record. The tables show how long it takes to "don" and "doff' various items, to wash hands, and to walk to assigned workstations.

 The following trial testimony emphasizes just how powerful the 12-D cook and acidification processes are:
Q. Ms. Hovde, yesterday there was a hypothetical example that was posed to Mr. Ramio, the plant manager at the Beloit facility, and it was regarding a world in which Hormel allows street clothes in the Beloit facility and doesn't require whites. Now in that world, according to the hypothetical, an avid fisherman who works at the Beloit facility would report to work with fish scales on his clothing and worms in his pockets. Based on the 12-D cook process you just described, what if those fish scales or those worms made their way into a can of Hormel product? Would they pose a threat to human safety?
A. I would argue that the heat process would destroy any organisms of concern.
Q. It might not he desirable to have those items in the can —
A. Correct.
Q. — but it certainly wouldn't be a food safety issue?
A. Correct.

 Similar to the lead opinion, I will also refer to Weissman v. Tyson Foods, Inc., as "Tyson Foods."

 Similar to the lead opinion, I will also refer to Integrity Staffing Solutions, Inc. v. Busk, as "Integrity Staffing."

 I agree with the lead opinion's and the concurring/dissenting opinion's conclusion that Tyson Foods need not be overruled because although the court of appeals applied a required-benefit test, it went on to discuss whether the "donning and doffing" under the circumstances present in that case were "integral and indispensable" to a principal activity.

 Congress enacted the Portal-to-Portal Act in an effort to remedy a judicial interpretation of the Fair Labor Standard Act that if permitted to stand would have "br[ought] about the financial ruin of many employers" and would have resulted in a windfall of payments to employees "for activities performed by them without any expectation of reward beyond that included in their agreed rates of pay." Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. 513, 517 (2014) (internal quotation marks omitted) (quoting 29 U.S.C. §§ 251(a)-(b)). The Portal-to-Portal Act exempted employers from liability for claims based on "activities which are preliminary to or postli-miary to said principal activity or activities." Id. (quoting 29 U.S.C. § 254(a)). These preliminary or postliminary activities "occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities." Id. (quoting 29 U.S.C. § 254(a)).

 Although this dissent refers most often to the lead opinion, the concurring/dissenting opinion suffers from the same shortfalls because it agrees with the lead opinion's point of view: "While I do not join the lead opinion, I agree with its conclusion that donning and doffing of company-required clothing and gear at the beginning and end of the workday is 'an integral part of a principal activity' of Hormel Foods Corporation for which compensation is required," concurrence/dissent, f 108 (footnote omitted) (citing Lead op., ¶ 7), and "I agree with the lead opinion's conclusion that *195 § DWD 272.12(2)(e)l. requires Hormel to compensate its employees for 5.7 minutes per day that have been cabined for donning and doffing clothing and equipment at the beginning and end of the workday," id., ¶ 117 (citing Lead op., ¶ 7).

 Indeed, the circuit court seems to have concluded that the "donning and doffing" of the "whites" is indispensable because it is required. This is a conflation of the required-benefit analysis and the "integral and indispensable" analysis.

 In an attempt to reach its current outcome, the concurring/dissenting opinion distorts the analysis for lunchtime "donning and doffing." Although the concurring/dissenting opinion believes the "donning and doffing" of the whites is "integral and indispensable" to "sanitary food production" at the beginning and end of the day, it concludes that the same " donning and doffing" of the same "whites" is no longer "integral and indispensable" to "sanitary food production" when done over the lunch hour. Concurrence/Dissent, ¶ 121. The concurring/dissenting opinion states,
First, no interest of Hormel is served by employees leaving its facility during lunch break. Stated otherwise, leaving Hormel's facility at lunch does not aid in sanitary food production, which is a principal activity of Hormel. Second, the choice to leave Hormel's facility at lunch is totally each individual employee's choice, not Hormel's.
Id., ¶ 122 (emphasis added). There are two problems with this conclusion.
First, the concurring/dissenting opinion focuses on what Hormel requires and whether Hormel benefits. As laid out in full earlier, conflating the required-benefit test with the "integral and indispensable" test goes against the law as clarified by the Supreme Court of the United States in Integrity Staffing.
Second, the concurring/dissenting opinion applies the wrong test by focusing on the employees' choice to leave. The test is whether the "donning and doffing" of the "whites" when entering and exiting the Beloit cannery (whether at the beginning and end of the day or at lunch) is "integral and indispensable" to canning food. The lead opinion and concurring/dissenting opinion say it is at the beginning and end of the day. Common sense would dictate that if "donning and doffing" the "whites" is "integral and indispensable" to canning food at the beginning and end of the day, then it must also be "integral and indispensable" to canning food at the middle of the day after lunch.

 Scott A. Ramio, plant manager at the Beloit cannery, testified that some of the chemicals the sanitation crew works *206 with are "very caustic or acidic and will cause skin damage, irritation." He went on to say the following:
Q. I'm sorry? Now, what, what are the cleaning materials please?
A. It can be any number of chemicals, but it's a foam that comes from a central foaming station that will break the surface tension of the product on to the stainless steel. ... So the foam that he's using and applying there is corrosive materials that you have to be protected from. And he'll spray that. After he's done, a quick rinse of the equipment when he first got to it, then he'll come and put that foam over the entire, all that equipment. You can see it's foam because it clings.
(Emphasis added.)

 Interestingly, the employees in Tyson Foods primarily made pepperonis.

 Scott Ramio, plant manager at the Beloit facility, testified, "There are certain things that you should probably do if you're making bacon or pepperoni or something that somebody's going to eat right out of the package versus what we do, which is a thermos-processed product that's fully processed in a can, very different than some other products."

 As stated previously, we were called upon to determine whether the de minimis doctrine applies in Wisconsin. This was a question of first impression for this court. The concurring/dissenting opinion appears to adopt the de minimis doctrine in Wisconsin. It states, "I adopt and apply the Lindow test. .. .," concurrence/dissent, f 130, and "If the time allocated for donning and doffing were not cabined at a specified number of minutes per employee per workday, the de minimis rule would preclude compensation . . . .," id., ¶ 109. But the concurring/dissenting opinion fails to explain why it chooses to adopt the de minimis doctrine in Wisconsin. Similar to choosing not to answer the question at all, blind adoption of the doctrine without any explanation fails to help "develop, clarify or harmonize the law." Wis. Stat. § 809.62(lr), (lr)(c).

 If we adopt this approach, then one possible way of resolving this issue would be as follows: (1) if a court concludes that an activity is not "integral and indispensable," then the analysis ends and no compensation is owed; but (2) if a court concludes that an activity is "integral and indispensable," then *211 it must next consider whether the time spent on that activity is so short in duration that it qualifies as de minimis, in which case the time is not compensable. Under this approach, because the lead opinion and the concurring/dissenting opinion concluded that the time spent "donning and doffing" is "integral and indispensable," they would need to then consider whether that time is so short in duration that it qualifies as de minimis. If it qualifies as de minimis, then no compensation is due.

 Simply put, the lead opinion had an abundance of options in this case, but it chose none. The lead opinion could have concluded that the de minimis doctrine does not apply in Wisconsin. The lead opinion could have concluded that the de minimis doctrine applies in Wisconsin and then provided a practical framework for how to conduct a de minimis analysis. The lead opinion could have concluded that the de minimis doctrine applies and then held that the 2.903 minutes spent donning and doffing each day was too long in duration to qualify as de minimis. Rather than choose any of the above options, the lead opinion picked an outcome and reached a conclusion for these litigants on this day.

 The concurring/dissenting opinion also notes that the lead opinion dodges the question of whether the de minimis doctrine applies in Wisconsin: "The lead opinion concludes that *212 donning and doffing at the beginning and end of the workday are not de minimis, assuming that the de minimis rule may be applied to the Union's claims." Concurrence/Dissent, ¶ 1125 (emphasis added).

 Again unsurprisingly, the concurring/dissenting opinion also gives Anderson, the Supreme Court of the United States decision that created the de minimis doctrine, a fleeting glance. The concurring/dissenting opinion mentions Anderson a meager three times in its entire de minimis discussion, which spans approximately five pages. See Concurrence/Dissent, ¶¶ 126, 128, 131. Rather than rely on a Supreme Court decision, the concurring/dissenting opinion roots its analysis in a Ninth Circuit opinion, Lindow v. United States, 738 F.2d 1057 (9th Cir. 1984). In fact, the concurring/dissenting opinion formally "adopt[s] and applies] the Lindow test." Concurrence/Dissent, ¶ 130.
Lindow is cited by federal courts for its four-factor de minimis approach. Under Lindow, a de minimis determination looks at (1) the amount of daily time spent on the additional work, (2) the administrative difficulty in recording that additional time, (3) the aggregate amount of compensable time, and (4) the regularity of the additional work. 738 F.2d at 1062-63. Missing from the concurring/dissenting opinion's discussion of Lindow is a critical quote from Lindow: "Most courts have found daily periods of approximately 10 minutes de minimis even though otherwise compensable." Id. at 1062. Lindow itself stands for the proposition that the 7 to 8 minutes employees spent on activities qualified as de minimis. Id. at 1063-64.

 The lead opinion does not cite Lindow, but it arguably is where the lead opinion hand-picked the aggregate sum factor. If so, the lead opinion conveniently forgot to look at the first factor: "the amount of daily time spent on the additional work." Lindow, 738 F.2d at 1062 (emphasis added).

 The concurring/dissenting opinion also utilizes an aggregate sum factor: "In addition, although 5.7 minutes per day is a small amount of time, because it is expended every day, the aggregate amount of each employee's claim per year is $500, which is significant. It is also significant to Hormel as an aggregate amount for all food preparation employees." Concurrence/Dissent, ¶ 136 (emphasis added). Not only is the lead opinion's and the concurring/dissenting opinion's seemingly outcome oriented choice to ground their analyses in an aggregate sum factor not supported by the law (namely, Anderson), but also their outcome leads to disparate treatment under the law. Ade minimis analysis that is focused on a dollar figure will favor those employees who are paid a higher wage. Employees who make only $5 per hour and file a wage and hour claim will have their aggregate sum declared de minimis, but employees who make $22 per hour will have their aggregate sum declared not de minimis. Perhaps this is why Anderson's focus was on time, and whether the activity concerned just a few "minutes or seconds."

 The concurring/dissenting opinion also creeps past the time predicament but does so in a different way. The concurring/dissenting opinion concludes,
If the time allocated for donning and doffing were not cabined at a specified number of minutes per employee per workday, the de minimis rule would preclude compensation because keeping accurate payroll records of the varying time that each employee spends donning and doffing would appear to be a nearly impossible administrative task for Hormel.
Concurrence/Dissent, ¶ 109. In sum, because the parties stipulated to 5.7 minutes, 5.7 minutes is not de minimis. Otherwise, 5.7 minutes would be de minimis. According to the